**INTERNATIONAL TELEPHONE AND TELEGRAPH CORPORATION and International Standard Electric Corporation**

v.

**The UNITED STATES et al.,**
**Third-Party Defendants.**

**No. 263–73.**

United States Court of Claims.

June 16, 1976.

Paul M. Craig, Jr., Washington, D. C., attorney of record, for plaintiffs; Melvin Kraus, Washington, D. C., of counsel.

Robert H. Plotkin, Washington, D. C., with whom was Asst. Atty. Gen. Rex E. Lee, Washington, D. C., for defendant; Vito J. DiPietro, Washington, D. C., of counsel.

Before COWEN, Chief Judge, DURFEE, Senior Judge, and KASHIWA, Judge.

OPINION

PER CURIAM.

This case comes before the court on defendant's request for review, pursuant to Rule 53(c)(3), of the opinion of Trial Judge Colaianni on the issue as to whether the application of the statute of limitations to plaintiffs' claim is tolled by 35 U.S.C. § 286. Upon consideration of the briefs and arguments of counsel, the court agrees with the trial judge's opinion, but we add the following:

In cases involving a statutory ambiguity similar to the one involved in this case, federal courts have allowed the expressed intention of Congress or a state legislature to prevail over the alleged plain-meaning of a statute. *See Southeastern Financial Corp. v. Smith,* 397 F.Supp. 649 (D.Ala. 1975); *Fleming v. Salem Box Co.,* 38 F.Supp. 997 (D.Ore.1940).[1]

In *Fleming,* the court refused to accept at face value a specific reference in section 17 of the Fair Labor Standards Act of 1938 to section 20 of the Anti-Trust Act. After examining the legislative history of the Fair Labor Standards Act, the court concluded that

a mistake was made in the substitution of the figures and that the intention was to refer to Section 17 of the Anti-Trust Act. A palpable clerical error clearly shown should not override legislative intention. [38 F.Supp. at 998.]

In *Southeastern Financial Corp. v. Smith, supra,* an assignee of the accounts receivable of a carpet seller brought an action against an individual who signed a check given in payment of an account of a corporate carpet purchaser. Any recovery by the

---

1. *See also Ronson Patents Corp. v. Sparklets Devices, Inc.,* 102 F.Supp. 123 (E.D.Mo.1951). In *Ronson,* the defendant had moved to dismiss a patent infringement suit on the ground that a private act of Congress extending plaintiff's patent for seven years was ineffective because the act had incorrectly specified the reissue date of the patent as "December 12, 1923." The correct date of reissue was December 12, 1933. In denying defendant's motion, the court observed that:

"Mere verbal inaccuracies, or errors in statutes in the use of words, numbers, grammar, punctuation, or spelling, will be corrected by the court, whenever necessary to carry out the intention of the legislature as gathered from the entire act. If the legislative intent is clear, it must be given effect regardless of inaccuracies of language. [102 F.Supp. at 124; *accord, J.* Sutherland, *Statutory Construction* § 47.37 (4th ed. Sands 1973).]"

plaintiff had to be under a particular Alabama state law enacted in 1959 as "Act 567." After its enactment, Act 567 had been unofficially codified at Title 39, § 53(1) of the Alabama Code. Subsequently, when the Alabama legislature adopted the Uniform Commercial Code, it purported to repeal, *inter alia*, "Title 39, §§ 1–12, inclusive, § 13, as amended, §§ 14–85, inclusive * * *." 397 F.Supp. at 654. The court observed that, on its face, this reference would seem to include Act 567. However, since no act of the Alabama legislature had been officially codified since the Alabama Code of 1940, the court concluded that

> all references in subsequent acts to Code provisions must be construed as applying only to the Code as it was codified in 1940, not as it might have been [unofficially] recompiled or recodified by the Code publisher. Thus, an act passed subsequent to the adoption of the Code of 1940 could be repealed only by specific reference to the act by number and year of adoption. That this is the understanding of the Alabama Legislature may be inferred from the repealing provision cited above, since the provision specifically repeals, in addition to the recited Code sections, a number of acts adopted subsequently to the 1940 Code. These later acts are repealed by reference to the act number and year of enactment. Therefore, it would stretch the legislature's intent to view the repeal of "§§ 14–85, inclusive," as repealing Act 567.

> Nor can it be inferred that this act was repealed by implication. This is a disfavored method of appeal [sic], and "[i]t is only when two laws are so repugnant to or in conflict with each other that it must be presumed that the Legislature intended that the latter repealed the former." *City of Birmingham v. Southern Express Co.,* 164 Ala. 529, 538, 51 So. 159, 162 (1909). Since the UCC provides contractual remedies while the statute here provides a tort remedy, there is no reason to assume that the legislature intended to repeal the latter by adoption of the UCC. [397 F.Supp. at 654.]

We conclude, therefore, that the legislative history, including the reports of the committees of the House and Senate, and the express language of Pub.L. 313, H.J. Res. 423, 82d Cong., 2d Sess.—all as set forth in the trial judge's opinion—demonstrate that Congress did not intend to repeal, and did not repeal, 35 U.S.C. § 91 by the enactment of Pub.L. 313 or the other Acts relied upon by defendant. Accordingly, the trial judge's opinion and conclusions of law are hereby affirmed and adopted as the opinion of the court; defendant's request for review is denied, and the case is remanded to the trial judge for further proceedings.

## OPINION OF TRIAL JUDGE

COLAIANNI, Trial Judge:

By motion of June 26, 1974, plaintiffs sought a separate trial on the issue of tolling of the time limitations on damages or, in the alternative, for a trial on additional infringements during a period more than 6 years prior to the filing of the petition. Plaintiffs' motion points out that the parties disagree on the applicability of 35 U.S.C. § 286 to the present case.

Section 286 of Title 35 U.S.C. tolls the 6–year limitation on damages for infringement of a patented invention for a period of up to 6 years between the filing of a claim for compensation with a department or agency of the Government that has authority to settle such claim and the date of denial of that claim.

Plaintiffs argue, in the numerous papers filed in support of their motion, that defendant's liability for procurement is not limited by 28 U.S.C. § 2501 to the 6 years immediately preceding the filing of their August 14, 1973, petition, but rather that the accounting period should extend back an additional 6 years because of plaintiffs' filing of an administrative claim with the Federal Aviation Administration (hereinafter referred to as "FAA") and/or the Coast Guard.

Defendant, in the various papers it has filed in opposition to plaintiffs' motion, argues that the FAA and the Coast Guard,

now agencies of the Department of Transportation, did not have authority to settle administrative claims for patent infringement at the time of plaintiffs' "negotiations" with them.

Plaintiffs contend, to the contrary, that section 3 of the Royalty Adjustment Act of 1942 (hereinafter referred to as the "RAA") gives all departments and agencies of the Government the authority to settle claims arising out of the use of patented inventions. Plaintiffs thus urge that section 3 of the RAA authorized administrative settlement of claims between them and the FAA and/or the Coast Guard. Plaintiffs further contend that the years spent in attempting to settle their claims with the above agencies, up to 6 years, should, in accordance with the letter and spirit of 35 U.S.C. § 286, be tacked on to the 6-year accounting period defined by 28 U.S.C. § 2501.

While it appears at first blush that the question of whether or not plaintiff's settlement discussions tolled the application of the 6-year time limitation on damages established by 28 U.S.C. § 2501 could be deferred to an accounting trial following the establishment of defendant's liability, plaintiffs point to the fact that different accused structures were purchased by defendant during the period immediately preceding August 14, 1967, from those after that date. Thus, different proofs will have to be submitted at trial to prove plaintiffs' claims of infringement for the 12-year period prior to the filing of their petition in this court. If the statute of limitations were not tolled, however, the procurement prior to August 14, 1967, would be of no moment and thus irrelevant to the pending litigation. Accordingly, it becomes necessary to establish whether or not the FAA and/or the Coast Guard had authority to settle administratively claims of infringement at the time of plaintiffs' negotiations.

Defendant raises a number of arguments to refute plaintiffs' contention concerning the present viability of section 3 of the RAA. The more serious of these are that:

1. The entire RAA was intentionally included in the * * * [Emergency Powers Continuation Act, hereinafter referred to as the "EPCA"] although drafts thereof, Executive Branch requests therefor, and the Interim EPCA included only Sections 1 and 2 thereof.

2. The legislative history of the EPCA and of the EPCA extensions show that the effect of Section 1(a) of that law was to repeal those statutes listed therein.

\* \* \* \* \* \*

5. Title 35, U.S.Code is a positive statement of the law and the absence therefrom of Section 91 is conclusive of the lack of effectiveness since July 1, 1953 of RAA Section 3.

\* \* \* \* \* \*

8. The Government Procurement Commission, the editors and compilers of the U.S.Code and the U.S.Code Annotated, and the Comptroller General were all correct in their opinions that:

a. There is a lack of authority to administratively settle claims for patent infringement in Government agencies other than the Defense Department, and

b. The Royalty Adjustment Act, 35 U.S.C. (1946 ed.) §§ 89–96, expired on July 1, 1953.

As explained hereinbelow, defendant's arguments are found to be unpersuasive, and it is concluded that 35 U.S.C. §§ 91–96 (1946 ed.) is permanent legislation which was not repealed by the Emergency Powers Continuation Act, Pub.L. 450, 82d Cong., 2d Sess.

### Background

The Royalty Adjustment Act of 1942, containing sections 1–10, was enacted as Pub.L. 768 during the 77th Congress. Sections 1 through 8 of that act were later codified as 35 U.S.C. §§ 89–96 (1946 ed.). Sections 9 and 10, the act's savings clauses, were included by a note following § 89.

Sections 89 and 90 of Title 35 provided that an agency was to inform a licensor whenever its head found that a patented or unpatented invention was being manufactured, used or sold for the United States under a license calling for the payment of royalties which he believed to be excessive.

The head of the agency could then call a hearing and by order fix the royalties deemed to be fair. The licensor's sole remedy was a suit to recover the difference between the royalties fixed and specified by the agency and the royalties found by the court to be fair and just compensation for the manufacture, use, sale, or other disposition of the licensed invention for the United States.

Section 91 of 35 U.S.C., formerly section 3 of the RAA, provides:

§ 91. *Adjustment of royalty rates; settlement and compromise of claims against the United States*

The head of any department or agency of the Government which has ordered the manufacture, use, sale, or other disposition of an invention, whether patented or unpatented, and whether or not an order has been issued in connection therewith pursuant to section 89 of this title, is authorized and empowered to enter into an agreement, before suit against the United States has been instituted, with the owner or licensor of such invention, in full settlement and compromise of any claim against the United States accruing to such owner or licensor under the provisions of sections 89–96 of this title, or any other law by reason of such manufacture, use, sale, or other disposition, and for compensation to be paid such owner or licensor based upon future manufacture, use, sale, or other disposition of said invention. (Oct. 31, 1942, ch. 634, § 3, 56 Stat. 1014.)

Another section relevant to the question at bar, 35 U.S.C. § 95, clearly indicates that 35 U.S.C. §§ 89 and 90 was to remain in force " * * * only during the continuance of the present war [World War II] and for six months after the termination thereof * * *." No such limitation is provided for the remaining sections. Thus, plaintiffs argue that 35 U.S.C. § 91 is permanent legislation which is in full force and effect to this date.

Defendant, on the other hand, points to the Emergency Powers Continuation Act, Pub.L. 450, 82d Cong., 2d Sess., which provided that each of the statutory provisions particularly delineated in that law was to remain in full force and effect to April 1, 1953.[1] Among the statutory provisions included in Pub.L. 450 was: "act of October 31, 1942 (ch. 634, 56 Stat. 1013; 35 U.S.C. 89 and note and 90–96) * * *." Defendant thus argues that Pub.L. 450 established an expiration date for the entire Royalty Adjustment Act and not only §§ 89 and 90 thereof. Because of the apparent ambiguity which exists between Pub.L. 450 and 35 U.S.C. §§ 89 and note and 90–96 (1946 ed.), it becomes necessary to review the legislative history leading up to the passage of Pub.L. 450 to establish its true intent and purpose.

In early 1952, this country was engaged in the Korean police action and President Truman depended upon power granted under a number of wartime laws for authority to perform certain necessary acts in furtherance of that action. Japan was the last country with which the United States was still technically at war, and thus a whole host of wartime laws continued to exist only because a peace treaty between Japan and the United States had not been signed. However, for a variety of reasons, this country in early 1952 was eager to sign a treaty of peace with Japan. As a result, the existence of several hundred wartime laws would have terminated, either immediately or within 6 months, following the signing of a peace treaty with Japan.[2]

The imminent signing of a peace treaty with Japan to officially terminate all World War II hostilities, coupled with the necessity of the President to continue exercising the powers permitted by these temporary statutory provisions during the Korean police action, prompted President Truman on February 19, 1952, to send a draft of a proposed joint resolution entitled: "A joint resolution to continue in effect certain statutory provisions for the duration of the

---

1. Extended to July 1, 1953, by Pub.L. 12, 83d Cong.

2. The peace treaty with Japan was signed on April 28, 1952.

national emergency proclaimed December 16, 1950, and 6 months thereafter, notwithstanding the termination of the existing state of war" to the Speaker of the House. The communication [3] specifically stated:

My Dear Mr. Speaker: I transmit herewith a draft Emergency Powers Continuation Act, recommended by the Secretary of Defense, the Attorney General, the Chairman of the National Security Resources Board, and the Director of the Bureau of the Budget, and I recommend immediate and favorable consideration of it by the Congress.

The purpose of this draft bill is to insure the continuation of certain specific powers which the Government is exercising for the preservation of the national security. Under the language used in the statutes conferring these powers they exist now only because we are still technically in a state of war. The only state of war still existing between this country and others is the state of war with Japan. Accordingly, unless the Congress acts to continue these powers they will end when that state of war ends or, in some cases, within a fixed period thereafter. The consideration of this measure is a matter of urgency since the treaty of peace with Japan has now been favorably acted on by the Senate Committee on Foreign Relations. * * *

The bill is based on an intensive study of Federal law, which took account of legislation enacted up to the close of the last session of Congress and even during the present session. But a limited purpose has guided the drafting. That purpose is to deal, in this bill, only with such of the war-dependent authorizations now existing as should be continued in the interest of national security during a period when disturbance in world affairs makes it necessary to exercise unusual powers. * * *

The following explanation [4] contained in an enclosure from the National Security Resources Board which accompanied President Truman's communication similarly attests to the concern that Congress continue legislation which was about to expire because of the signing of a peace treaty by the United States and Japan:

* * * It [the working group] first prepared a list of statutes, to include all existing statutory authorizations which would terminate upon the termination of the war with Japan, or the 1939 and 1941 emergencies, or at a fixed time thereafter. * * * The list of statutes was then circulated by the Bureau of the Budget with a covering memorandum which explained the assumptions on which it had been prepared and requested the agencies to give the Bureau their reasoned views as to which statutory authorizations set forth in the list should be continued after the termination of the war with Japan. The agencies were also requested to point out and make recommendations on any other existing war-dependent authorizations affecting them.

The draft bill and explanatory material [5] which accompanied President Truman's February 19, 1952, letter to Speaker of the House Rayburn provided in pertinent part:

Whereas the existing state of war with Japan is the last declared state of war to which the United States is a party and the termination thereof and of the national emergencies proclaimed in 1939 and 1941 would render certain statutory provisions inoperative; and

Whereas some of these statutory provisions are needed to insure the national security and the capacity of the United States to support the United Nations in its efforts to establish and maintain world peace: Now, therefore, be it

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled:*

**3.** H.R.Doc. No. 368, 82d Cong., 2d Sess. 1 and 2 (1952).

**4.** H.R.Doc. No. 368, 82d Cong., 2d Sess. 4 (1952).

**5.** H.R.Doc. No. 368, 82d Cong., 2d Sess. 5–6 (1952).

SECTION 1. Notwithstanding the termination hereafter of the war with Japan declared December 8, 1941 (55 Stat. 795), and of the national emergencies proclaimed by the President on September 8, 1939 (Proclamation 2352, 54 Stat. 2643), and on May 27, 1941 (Proclamation 2487, 55 Stat. 1647), and notwithstanding any proclamation of peace with respect to such war:

(a) The following statutory provisions shall remain in full force and effect until six months after the termination of the national emergency proclaimed by the President on December 16, 1950 (CFR, 1950 Supplement to title 3, p. 71) or until such earlier date or dates as the Congress by concurrent resolution either generally or for a particular statutory provision or the President either generally by proclamation or for a particular statutory provision may provide, any other terminal date or provision of law with respect thereto to the contrary notwithstanding:

&ast; &ast; &ast; &ast; &ast; &ast;

(33) Act of October 31, 1942, chapter 634, sections 1 and 2, 56 Statutes 1013 (35 U.S.C. 89, 90).

&ast; &ast; &ast; &ast; &ast; &ast;

Thus, it appears relatively clear that the draft bill proposed by President Truman only intended to deal with a small number of wartime provisions, including the royalty adjustment sections, 35 U.S.C. §§ 89–90, of the RAA.

Moreover, to emphasize the fact that President Truman only wanted Congress to extend the war-dependent sections of the RAA, 35 U.S.C. §§ 89–90, which by the terms of 35 U.S.C. § 95 would expire by the signing of the peace treaty with Japan, the explanation accompanying the draft bill provided: [6]

The draft Emergency Powers Continuation Act extends the life of about 60 specific statutory authorizations which, in the absence of action by Congress, would terminate upon the termination of the present state of war with Japan or of the national emergencies proclaimed by the President in 1939 and 1941, or, in some cases, within a fixed period thereafter. The bill provides, generally speaking, that these authorizations shall continue in effect until 6 months after the termination of the national emergency proclaimed by the President in 1950 or until earlier dates fixed by concurrent resolution of the Congress or by the President. Each provision affected by the bill is explained herein, with a short caption, a digest, and a brief justification of the action proposed. The statutory language referring to war or emergency is set forth in quotation marks and italics.

The bill may be summarized as follows:

Section 1(a) deals with certain provisions conferring authority in time of war or during the present war or the 1939 or 1941 national emergencies. These provisions are continued in effect.

The report went on to indicate that only §§ 89 and 90 were being considered. The report particularly provided: [7]

These sections provide authority for requiring the return to the Government of an amount representing the difference between royalty returns based upon prewar periods of normal production and those which would be appropriate to the expanded production caused by war. They are effective *"during the continuance of the present war and for 6 months after the termination thereof"* (35 U.S.C. 95).

In view of the current substantial increases in military procurement and the prospect that the national economy is facing a period of expanded production for military purposes, the continuation of this law is essential if the Government is to be protected against excessive increases in patent royalties originally based upon returns appropriate to periods of normal

6. H.R.Doc. No. 368, 82d Cong., 2d Sess. 10 (1952).

7. H.R.Doc. No. 368, 82d Cong., 2d Sess. 23 (1952), para. 33, *Adjustment of Royalties for Use of Inventions in Aid of Prosecution of the War* (35 U.S.C. 89, 90).

production. Legislation to make this wartime statute permanent law is being sponsored by the Department of Justice with the active support of the Department of Defense (H.R. 2257).

The Presidential communication occasioned a series of Senate and House joint resolutions, some of which resulted in Public Laws that are relevant to this inquiry with regard to the RAA. A brief discussion of the more pertinent resolutions and Public Laws follows.

On February 20, 1952, H.J.Res. 386, an exact copy of the draft bill proposed by President Truman's February 19, 1952, communication, was introduced before the 2d Session of the 82d Congress. Subcommittee hearings on this resolution were held on February 27, 28, 29; March 6, 7, 12, 13, 21, 24, 26, 28; and April 2, 7, 25, 28, 1952. The testimony of Robert S. Milans, Contract and Royalty Negotiations Branch, Patents Division, Department of the Navy, given on March 21, 1952, is the only portion of the hearings that in any way relates to the RAA. That testimony clearly indicates that only 35 U.S.C. §§ 89–90 was being considered by the committee.

On March 3, 1952, S.J.Res. 139 was introduced. This resolution was the first introduced in the Senate and thus is presumed to mirror the draft bill proposed by President Truman.

During the pendency of H.J.Res. 386 and S.J.Res. 139, and particularly during April of 1952, H.J.Res. 423 and S.J.Res. 148 were introduced. However, whereas the previous resolutions were directed at continuing the temporary statutory provisions identified in President Truman's draft bill until 6 months after termination of the national emergency proclaimed by President Truman on December 16, 1950, the latter resolutions sought to continue the effectiveness of the temporary statutory provisions until

July 1, 1952. The reason for what may appear to be a duplication of efforts was the failure of Congress to pass legislation to continue the President's emergency powers since his February 19, 1952, request.

The possibility that a peace treaty with Japan would be signed during the approaching Congressional Easter recess prompted President Truman to request, in an April 7, 1952, letter to the Speaker of the House, Sam Rayburn, to " * * * extend for a period of 60 days emergency powers which otherwise will terminate when the treaty of peace with Japan becomes effective."

S.Rep.No.1451, 82d Cong., 2d Sess., dated April 8, 1952, refers to President Truman's April 7, 1952, message and recommends passage of S.J.Res. 148 (which corresponded to H.J.Res. 423) to temporarily extend until July 1, 1952, certain statutory provisions. Attached to the report was a memorandum prepared by the Bureau of the Budget that classified, according to subject matter, the statutory provisions dealt with in the proposed Emergency Powers Continuation Act. The memorandum, by using the same paragraph designation used in President Truman's draft bill, i. e., 1(a)(33), to designate only 35 U.S.C. §§ 89 and 90 of the RAA, clearly indicates that the entire RAA was not under consideration.

Pub.L. 313, H.J.Res. 423, 82d Cong., 2d Sess., entitled the "Emergency Powers Interim Continuation Act" was approved on April 14, 1952. The law extended " * * needed statutory provisions * * * until June 1, 1952" and provided in pertinent part: [8]

> *Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That notwithstanding the termination hereafter of the war with Japan declared December 8, 1941 (55 Stat. 795), and of the

---

8. While defendant argues that the emphasized language is broad enough to include permanent sections of the statutory provisions, including the permanent sections of the RAA, defendant's argument is not persuasive since, even under a literal reading of the emphasized language, the permanent sections of the RAA did not recite any terminal dates, were not dependent on any provisions of law, nor were they limited by reference to war or national emergency.

national emergencies proclaimed by the President on September 8, 1939 (Proc. 2352, 54 Stat. 2643), and on May 27, 1941 (Proc. 2487, 55 Stat. 1647), and notwithstanding any proclamation of peace with respect to such war—

(a) Except insofar as they otherwise have further effectiveness the following statutory provisions and the authorizations conferred and liabilities imposed thereby shall remain in full force and effect to and including June 1, 1952, *notwithstanding any other terminal date or provision of law with respect to such statutory provisions and notwithstanding any limitation, by reference to war or national emergency,* of the time during or for which authorizations or liabilities thereunder may be exercised or imposed; and acts or events of the kind giving rise to legal consequences under any of those provisions when performed or occurring during the existing state of war shall give rise to the same legal consequences when they are performed or occur during the period above provided for. [Emphasis added.]

The law, however, differed from both President Truman's draft bill and the still pending H.J.Res. 386 with regard to the sections of the RAA which were to be included. Whereas both President Truman's draft bill and H.J.Res. 386 only referred to 35 U.S.C. §§ 89 and 90, the sections of the RAA which by 35 U.S.C. § 95 were intended to remain in force only during the continuance of the present war and 6 months, Pub.L. 313 identified the entire RAA as one of the statutory provisions to be extended.

No explanation or reasons for the inclusion of all sections of the RAA appear in Pub.L. 313.

The effectiveness of the statutory provisions covered by Pub.L. 313 was continued from June 1, 1952, to June 15, 1952, as a result of S.J.Res. 156. That resolution explained that S.J.Res. 139 was still under consideration and that the temporary extension to June 1, 1952, provided by Pub.L. 313 had not provided adequate time for the

Senate to complete its studies. It, therefore, recommended that the involved statutes be " * * * extended for a future period until June 15, 1952," which recommendation became Pub.L. 368 on May 28, 1952.

On June 6, 1952, the Committee on the Judiciary, to which a new H.J.Res. 477 had been referred, reported, by way of H.Rep. No.2041, favorably thereon without amendment and recommended its passage. However, the committee recommended that the statutory provisions affected be continued for the duration of the national emergency proclaimed on December 16, 1950, and 6 months thereafter, but not beyond June 30, 1953. The statement accompanying the report reflects that the committee was intent on continuing a number of statutory provisions which would have expired by their own terms upon the termination of the existence of a state of war with Japan or the national emergencies proclaimed by the President in 1939 and 1941, or in some cases, within a fixed time therefrom. The report set out the committee's analysis of each of the statutory provisions recommended by President Truman on February 19, 1952, along with the committee's recommendations and reasons therefor. The following appears with regard to 35 U.S.C. §§ 89 and 90, item 1(a)(33) on President Truman's draft bill:[9]

### Adjustment of Royalties for Use of Inventions in Aid of Prosecution of the War (35 U.S.C. 89, 90)

These sections provide authority for requiring the return to the Government of an amount representing the difference between royalty returns based upon prewar periods of normal production and those which would be appropriate to the expanded production caused by war. They are effective *during the continuance of the present war and for 6 months after the termination thereof* (35 U.S.C. 95).

The committee recommends that this item be continued, with language clarify-

---

**9.** H.Rep. 2041, 82d Cong., 2d Sess. 25 (1952).

ing its application to a period in which there is no formally declared state of war.

The committee is mindful that such intervention on the part of the Government is an invasion of the right of contract between the licensor and the licensee; a contract to which the Government was not a party. Nevertheless the committee is of the opinion that when a period of war or national emergency exists an individual is not entitled to excessive profits but rather owes a duty to the country to accept what is reasonable compensation under the circumstances. There is now pending before the Judiciary Committee permanent legislation on this subject.

It thus appears that the House Judiciary Committee, as late as June 6, 1952, only intended to include the war-dependent sections of the RAA among the statutory provisions covered by the Emergency Powers Continuation Act.

As of June 11, 1952, the Judiciary Committee for the Senate, to which S.J.Res. 139 had been referred, was still unable to make its recommendations. The committee, accordingly, recommended the adoption of H.J.Res. 164 to further extend the life of the 60 emergency statutes to June 30, 1952. On June 14, 1952, Pub.L. 393 accomplishing that purpose was approved.

S.Rep.No.1744, on June 12, 1952, reported the Senate Judiciary Committee's recommendation on S.J.Res. 139. The report states:

The Committee on the Judiciary, to which was referred the communication of February 19, 1952, from the President of the United States requesting legislation to continue in effect certain statutory provisions having considered the same, reports an original joint resolution and recommends that such resolution be adopted.

The report recognized the purpose of S.J. Res. 139 was—

* * * to provide further *extension of certain emergency powers* heretofore enacted by the Congress for a period en-

compassing the duration of the emergency (plus 6 months) declared by the President on December 16, 1950 * * *. [Emphasis added.]

The statement accompanying the report echoes the same sentiments which were found in the statement accompanying H.Rep. 2041 and indicates a strong intent on the part of the Senate committee to continue the statutory provisions " * * * whose effectiveness depended upon the existence of a state of war or the emergencies referred to above" (the national emergencies previously proclaimed on September 8, 1939, and May 27, 1941). The report cataloged each of the statutory provisions included in President Truman's February 19, 1952, draft bill under 1 of 9 categories. The language used to include the RAA under the *"Construction, procurement and sale"* category, *i. e.,* "Adjustment of royalties for use of inventions in aid of prosecution of the war. 1(a)(33)" is strong evidence that the committee limited its consideration to 35 U.S.C. §§ 89 and 90 of the act. This is confirmed by the abstract of the testimony which appears at pp. 31 and 32 of S.Rep.No. 1744.

### Public Law 450 did not Expressly Repeal 35 U.S.C. §§ 91–96

■ It would, of course, be helpful to know the exact reason why Pub.L.Nos. 313, 368, 393 and 450 referred to 35 U.S.C. § 89 and note and §§ 90–96, whereas H.J.Res. 386 and presumably S.J.Res. 139, which were still under consideration at the time that Pub.L.Nos. 313 and 368 were passed only included 35 U.S.C. §§ 89 and 90 among the 60 temporary statutory provisions to be extended. Unfortunately, the exact reason appears lost in the passage of time.

The above exhaustive review of available House and Senate documents related to Pub.L. 450 nonetheless makes abundantly clear that the intent of both the House and Senate was to continue the effectiveness of some 60 temporary statutory provisions identified therein to April 1, 1953. These documents are totally devoid of any indication that either the House or Senate intend-

ed to use Pub.L. 450 as a vehicle to repeal permanent legislation generally and §§ 91–96 of Title 35 in particular. Rather, the obvious intent of both the House and Senate was to continue for a temporary period wartime measures which would have expired as a result of the signing of the Japanese Peace Treaty.

A logical explanation for the inclusion of all sections of the RAA in Pub.L. 450 is suggested from the fact that the temporary sections, 35 U.S.C. §§ 89 and 90, are referred to in the other sections of the RAA. Moreover, § 95 contains the language:

Sections 89 and 90 of this title shall remain in force only during the continuance of the present war [World War II] and for six months after the termination thereof * * *.

Accordingly, Congress could have referred to all sections of the act in Pub.L. 450 to emphasize and make clear that the temporary aspects of the act, regardless of where they were referred to, would be continued only to April 1, 1953, and no longer.

### 35 U.S.C. §§ 91–96 was not Repealed by Implication

As shown above, it is impossible to conclude that Congress sought to expressly repeal the permanent sections of the RAA. It is also concluded that Congress did not intend a repeal by implication of those sections.

▮ Defendant argues that the passage by Congress of 10 U.S.C. § 2386, which authorizes military departments of the Department of Defense to use funds to acquire, *inter alia,* licenses under patents and, as well, settle past claims of patent infringement, obviated the need for a permanent Royalty Adjustment Act. In defendant's own words: [10]

* * * the conclusion is inescapable that Congress, having decided not to extend or make permanent the Royalty Adjustment Act and having granted the mil-

itary departments statutory authority to buy rights in patents, copyrights and technical data (10 U.S.C. § 2386), had done all that the executive agencies really required and passed no further legislation in this area.

Defendant's arguments are unpersuasive and fail to acknowledge the long-established rule of statutory construction that frowns upon repeals by implication. This long-established rule is explained by the Supreme Court in the case of *United States v. Borden Co.,* 308 U.S. 188, 198, 60 S.Ct. 182, 188, 84 L.Ed. 181 (1939), where that Court stated:

* * * It is a cardinal principle of construction that repeals by implication are not favored. When there are two acts upon the same subject, the rule is to give effect to both if possible. [Citations omitted.] The intention of the legislature to repeal "must be clear and manifest. *Red Rock v. Henry,* 106 U.S. 596, 601, 602 [1 S.Ct. 434, 27 L.Ed. 251]."

That course of action has been consistently followed by this court.[11] Indeed, in the case of *Casman v. United States,* 181 F.Supp. 404, 406, 143 Ct.Cl. 16, 20 (1958), where a similar argument was urged, this court stated:

* * * the Government argues that the Veterans' Preference Act, supra, does not apply to the Foreign Service, that the Foreign Service Act, 60 Stat. 999, 22 U.S. C.A. § 801, superseded the Veterans' Preference Act and repealed by implication the transfer provisions of section 12. Admittedly, there is no express repeal provision in the Foreign Service Act.

It is a familiar rule that repeal by implication is found only by reason of necessity, and repeals by implication are consistently frowned upon. Moreover, the intention of the legislature to repeal "must be clear and manifest." * * * It is further the rule that except in cases of clear repugnancy between an earlier

---

10. Page 21 of defendant's July 19, 1974, brief in opposition.

11. *See Ross v. United States,* 75 F.Supp. 725, 110 Ct.Cl. 190, *cert. denied,* 334 U.S. 832, 68 S.Ct. 1345, 92 L.Ed. 1759 (1948); *Badders v. United States,* 97 Ct.Cl. 506 (1942).

and a latter statute, the latter statute will not be deemed to have repealed the earlier, but effect to both should be given if possible.

### *Omission of 35 U.S.C. §§ 91–96 from the Code is of no Legal Significance*

■ The failure of codifiers to include 35 U.S.C. §§ 91–96 in the 1952, 1958, 1964 and 1970 additions of the United States Code is of no legal significance. These particular statutes have since the passage of the Emergency Powers Continuation Act, Pub.L. 450 of the 82d Congress and Pub.L. 12 of the 83d Congress, received curious treatment. For example, the 1952 edition of the Code which became effective on January 2, 1953, indicates in the distribution table [12] for the new Title 35, which was intended to "show[ing] distribution of all sections of former Title 35," that former sections 89–96 of Title 35 "had expired." Yet, Pub.L. 12 of the 82d Congress had extended a number of the statutory provisions mentioned in Pub.L. 450, including the RAA, to July 1, 1953. While various explanations may be advanced for this treatment, it does highlight the fact that errors occur even in the United States Code. That the codifiers themselves would readily admit to this is evidenced from the following quotation from the preface to the 1970 edition.

The Committee on the Judiciary invites criticisms or suggestions with the view of improving the Code wherever possible. It is hoped that the program of enacting the entire Code, title by title, to improve its present status as merely prima facie evidence of the law, will meet with early success.

From the language which follows, it is clear that the Fifth Circuit Court of Appeals [13] in the case of *Murrell v. Western Union Telegraph Co.,* 160 F.2d 787, 788 (5th Cir. 1947), has reached the same conclusion:

The United States Code was not enacted as a statute, nor can it be construed as such. It is only a *prima facie* statement of the statute law. The statutes collected in it did not change their meaning nor acquire any new force by their inclusion. If construction is necessary, recourse must be had to the original statutes themselves.

Decisions by this court also recognize that errors can occur in the United States Code and that the Code is merely *prima facie evidence of the law.* Indeed, the following language in the case of *American Export Lines, Inc. v. United States,* 290 F.2d 925, 928–29, 153 Ct.Cl. 201, 207 (1961), indicates that this court recognizes that the statutes at large prevail over the Code when the two are inconsistent:

It will be noted that 50 App.U.S.C. § 1738(b) (1952 and 1958 Eds.) omits the following language which appears in the original statute:

* * * but, except upon the affirmative vote of not less than four members of the Commission, such rate shall not be less than 15 per centum per annum of the statutory sales price (computed as of the date of charter).

*    *    *    *    *    *

* * * apparently the codifiers thought that the sentence was no longer in force and effect.

We think this was erroneous. The omitted sentence declares the policy of Congress relative to the amount of basic charter hire to be charged, except in exceptional circumstances. It was the clear purpose of Congress that the basic charter hire should not be fixed at less than 15 percent, unless it was clearly in the public interest that it be fixed at a lesser percentage. The codification should have retained an appropriate expression of this congressional purpose.

It is well settled that "the Code cannot prevail over the Statutes at Large when the two are inconsistent." *Stephan v. United States,* 319 U.S. 423 [63 S.Ct. 1135, 87 L.Ed. 1490]; *Royer's Inc. v. United*

---

12. Vol. 8, U.S.Code, p. 8809, "Title 35—Patents."

13. *See also Ashley v. City of Anchorage,* 95 F.Supp. 189 (D.C. Alaska 1951), aff'd, (9 Cir.) 196 F.2d 809.

*States,* 3 Cir., 265 F.2d 615. The provisions of the Code are merely *prima facie* evidence of the law. 1 U.S.C. § 204(a).

■ Equally unpersuasive are the arguments:

(1) that the failure by any agency to use the settlement clause of the RAA is evidence of its repeal; and

(2) that the Commission on Government Procurement [14] would not have recommended in 1972 that all agencies be authorized to settle patent infringement claims with available appropriated funds if that authority existed in 35 U.S.C. § 91.

A possible explanation for the action by the Commission on Government Procurement may be that it was totally unaware of 35 U.S.C. § 91. Another possible explanation could be that it was aware of that statute but accepted the United States Code's recitation that it "had expired" at face value without making its own investigation. In any event, the failure of the Commission on Government Procurement to recognize the existence of 35 U.S.C. § 91 is of no moment and cannot be accepted as evidence of its expiration.

The short answer to the argument concerning nonuse of 35 U.S.C. § 91 speaking to its expiration is found in the case of *Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 437, 88 S.Ct. 2186, 2202, 20 L.Ed.2d 1189 (1968), where, when faced with a similar contention regarding a post-Civil War statute the Supreme Court quoted the following language from the oral argument of the Attorney General of the United States with approval: "The fact that the statute lay partially dormant for many years cannot be held to diminish its force today."

■ Thus, it is concluded that 35 U.S.C. §§ 91–96 was passed as permanent legislation, that it has not been expressly or implicitly repealed, and that it remains in full force and effect to this day.

Because this opinion involves an issue of controlling importance to the outcome of this litigation, within the meaning of Rule 53(c)(2)(i), any party dissatisfied with the order may, in accordance with Rule 53(c)(3), request a review.

---

14. Vol. 4, p. 124, of the 1972 report by the Commission on Government Procurement.