The PRAIRIE BAND OF the
POTTAWATOMIE TRIBE
OF INDIANS, et al.,

v.

The UNITED STATES.

Appeal No. 6–76.

United States Court of Claims.

Oct. 19, 1977.

Jack Joseph, Chicago, Ill., and Robert C. Bell, Jr., New Canaan, Conn., attorneys of record in Dockets 71 and 29–A, for appellants-cross appellees.

Robert S. Johnson, Topeka, attorney of record in Docket 15–C; Louis L. Rochmes, Washington, D. C., of counsel.

A. Donald Mileur, Washington, D. C., with whom was Asst. Atty. Gen. Peter R. Taft, Washington, D. C., for appellee-cross appellant; John B. Carlson and Bernard M. Sisson, Washington, D. C., of counsel.

Rodney J. Edwards, Duluth, Minn., for The Minnesota Chippewa Tribe, et al., amici curiae.

Before COWEN and DURFEE, Senior Judges, DAVIS, NICHOLS, KUNZIG, and BENNETT, Judges, en banc.

DAVIS, Judge.

In *Prairie Band of the Pottawatomie Tribe v. United States,* 28 Ind.Cl.Comm. 454 (1972), the Indian Claims Commission (Ind. Cl.Comm.) held that the Pottawatomi Tribe or Nation ceded to the United States (under the Treaty of September 26, 1833, 7 Stat. 431, and the Articles Supplementary of September 27, 1833, 7 Stat. 442) its recognized title to Royce Area 187 in eastern Wisconsin and northeastern Illinois, a large part of Royce Area 160 in Wisconsin, and Royce Areas 188–190 in southwestern Michigan.[1] In the proceeding now under review the Commission determined the value of the ceded lands as well as the value of the consideration the Indians received from the Government, including all payments on the claim. The findings were that the Pottawatomis had ceded 5,220,868 acres with a fair market value of $6,600,000—about $1.26 per acre—[2] and that in exchange for these lands the United States gave a total of only $2,360,800 in return. Since the Commission held this consideration to be unconscionably small, the latter figure was offset against the former, and the United States found liable for $4,239,200. 38 Ind. Cl.Comm. 128, 229–30, 341–42 (1976). Both sides have appealed, each challenging selected aspects of the Commission's determination.

### I

#### *Plaintiffs' appeal*

A. Plaintiff-appellants' first point concerns the valuation of the timbered property. Among the more-than-5 million acres ceded by plaintiffs there were about one million of timberlands. The Indians' expert valued these at $11 an acre, while the defendant's witness thought them worth only $.35. The Commission did not

---

1. The references are, of course, to Royce's maps in the 18th Annual Report of the Bureau of American Ethnology (Part 2), Indian Land Cessions (1896–97).

   In 28 Ind.Cl.Comm. 454, 469, the Commission also held that the plaintiffs in Dockets No. 15–C (Prairie Band of the Pottawatomie Tribe of Indians, et al.), No. 29–A (Hannahville Indian Community, et al.) and No. 71 (Citizen Band of Pottawatomi Indians) could sue in a representative capacity for and on behalf of the Pottawatomi Tribe or Nation.

2. The valuation date was February 21, 1835. 28 Ind.Cl.Comm. at 497.

value the timberland separately; its determination of $1.26 per acre covered all the ceded land.[3] But it is quite clear both that the Ind.Cl.Comm. affirmatively took account of the timber as adding value, and that it considered the timbered acres to be worth more than the $1.26 average. In summing up its holding on valuation of the ceded territory, the opinion below declared that "about a million acres were in the timber-pinery region of northeastern Wisconsin, most of which were potentially valuable for commercial lumber development," 38 Ind.Cl.Comm. at 187, and in rejecting the defense estimate it said that "the defendant's failure to find any enhancement of the pinery lands by reason of the potential value of the timber resulted in substantially underestimating the value of these lands." 38 Ind.Cl.Comm. at 182. The Commission also referred expressly in some detail to the growing market for timber "with the growth and development of the midwestern portions of the country." 38 Ind.Cl.Comm. at 142–43, 182–83, 250, 252–53. It likewise observed that the timber resources of the ceded areas were an example of a feature which contributed particularly to the value of parts of the tracts and made those portions "much more valuable than $1.25 an acre, the price at which they were sold by the United States." 38 Ind.Cl.Comm. at 186. It is plain, therefore, that timber value was affirmatively taken into account as a substantial element.

Nevertheless, plaintiffs challenge a glancing comment the Commission made in rejecting the Indian expert's high timberland valuation of $11 an acre—a remark which recalled that at that time loggers entered public lands to cut down trees, either in flagrant trespass or under logging permits which the War Department issued without statutory authority.[4] From this the Pottawatomis infer that the Commission improperly reduced the value of the Indians' pine tracts because the Federal Government wrongly permitted outsiders to remove the Indians' timber (before the cession) without paying compensation. We think that appellants read far too much into this brief and somewhat cryptic remark of the Commission. It was offered as only one of several reasons why $11 per acre was excessive, not as a ground for choosing the over-all figure of $1.26 per acre or for disregarding the worth of the timberlands. As we have pointed out, the Commission plainly thought that, whatever depredations there may have been, the timberlands did have superior value and it gave credit for that factor. Moreover, the Ind.Cl.Comm's words about outsiders acquiring timber "without purchasing the land, even though the acquisition was illegal" could well have referred only to logging trespassers who commonly carried out their illegal actions on public lands generally, not Indian lands alone.[5] If so, it is hard to say that the Commission had to blind itself completely to a common fact-of-life in that era, not confined to na-

3. This method of evaluating the property as a whole, not appraising the various value components separately and then adding them, was appropriate and is not challenged. *See, e. g., Citizen Band of Potawatomi Indians v. United States,* 391 F.2d 614, 624, 179 Ct.Cl. 473, 491 (1967), *cert. denied,* 389 U.S. 1046, 88 S.Ct. 771, 19 L.Ed.2d 839, 390 U.S. 957, 88 S.Ct. 1046, 19 L.Ed.2d 1152 (1968).

4. The statement plaintiffs attack was as follows: "Considering the risks involved in the lumber industry, *and considering that much of the timber could be acquired without purchasing the land, even though the acquisition was illegal,* it seems doubtful that a purchaser who wanted to acquire the timber as well as the land would pay almost nine times as much for the pinery lands as the $1.25 for which the

United States offered to sell it" (emphasis added). 38 Ind.Cl.Comm. at 181–82. Elsewhere in its opinion and findings, the Commission referred descriptively to such logging operations on plaintiffs' land by trespassers and by loggers who had received unauthorized permits from the War Department. 38 Ind.Cl.Comm. at 144, 171, 250–51.

5. The Commission may even have been referring to trespass depredations after the Indian lands passed into federal ownership, not while the Indians owned it. Conversely, the opinion may not have had in mind the grant by the War Department, without statutory authority, of logging permits on Indian tracts. It is difficult to decipher precisely what the short comment was intended to cover.

tive territory. Though the United States had a special obligation to try to protect Indian timber, *Oneida Tribe v. United States,* 165 Ct.Cl. 487, *cert. denied,* 379 U.S. 946, 85 S.Ct. 441, 13 L.Ed.2d 544 (1964), it was severely hobbled in several ways during that period, *see* 165 Ct.Cl. at 496–500, and on this record there is no reason to believe that it could be expected to stop the cutting of the plaintiffs' lumber although it was powerless to protect other federal areas.

■ Our conclusion on plaintiffs' first point is that they have failed to show that the decision below permitted the Government to reduce the value of the ceded lands—in this proceeding—by reliance on its own wrong.

■ B. As part of the consideration for the cession, the United States agreed to pay the Pottawatomis $280,000 in annuities of $14,000 per year for 20 years. 7 Stat. at 432. The Commission's ruling deducted the full $280,000 even though the payments were strung out over two decades. 38 Ind. Cl.Comm. at 218–19. Plaintiffs contended below, and argue here, that only the commuted value of the $280,000 payment on the valuation date (*i. e.,* $174,508) should have been offset against the value of the cession. They rely upon *Miami Tribe v. United States,* 281 F.2d 202, 150 Ct.Cl. 725, *cert. denied,* 366 U.S. 924, 81 S.Ct. 1350, 6 L.Ed.2d 383 (1961), and *Crow Tribe v. United States,* 284 F.2d 361, 151 Ct.Cl. 281, *cert. denied,* 366 U.S. 924, 81 S.Ct. 1350, 6 L.Ed.2d 383 (1961). *See also United States v. Absentee Shawnee Tribe,* 151 Ct.Cl. 700 (1960), *cert. denied,* 366 U.S. 924, 81 S.Ct. 1351, 6 L.Ed.2d 384 (1961) (per curiam order). The Commission, however, followed the later decision in *Pawnee Indian Tribe v. United States,* 301 F.2d 667, 157 Ct.Cl. 134 (1962), *cert. denied,* 370 U.S. 918, 82 S.Ct. 1556, 8 L.Ed.2d 498 (1962), which overruled *Miami Tribe, Crow Tribe,* and *Absentee Shawnees* on this very point, and held that the full face value of the annuities should be deducted as consideration. *Pawnee Indi-*

*an Tribe* held that allowing commutation down to present value would be tantamount to charging the United States with interest, contrary to the established rule.

Although the Indian appellants ask us to abandon *Pawnee Indian Tribe* and revive *Miami Tribe* and *Crow Tribe,* we are not willing to do so. Litigation under the Indian Claims Commission Act is coming to its close. *Pawnee* has been the law for 15 years[6] and in all probability has been relied upon in other adjudications and settlements. The canon against allowance of interest in nonconstitutional cases (except where statute or contract provides)—on which the court relied in *Pawnee*—has been strengthened over the years not weakened, for Indian cases as well as others. *See, e. g., United States v. Mescalero Apache Tribe,* 518 F.2d 1309, 1314 ff., 207 Ct.Cl. 369, 378 ff. (1975), *cert. denied,* 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976). There is, we think, insufficient ground in this instance for rejecting the counsel of *stare decisis. Cf. Mississippi River Fuel Corp. v. United States,* 314 F.2d 953, 958, 161 Ct.Cl. 237, 246–47 (1963) (Davis, J., concurring).

■ C. The last of plaintiffs' claims on appeal is that the Commission erred in crediting the Government, as part of the consideration for the land cession, with treaty-mandated payments to Pottawatomi chiefs, other individual Indians, and creditors of the tribe. The 1833 treaty and its supplementary articles, 7 Stat. at 431–33, 442–43, called for annuities to a number of Indian chiefs, a fund for individual Indians whose requests for reservations had been denied, and a fund to satisfy creditors of the Indians. It is said that these payments were either in the nature of bribes or were non-tribal payments which should not have been deducted from the value of the ceded territory in this tribal proceeding. The Commission rejected these arguments. 38 Ind.Cl. Comm. at 217–218, 220.

We cannot say that this ruling was wrong. The treaty (including the supple-

---

6. *Miami Tribe* reigned for less than two years.

mentary articles) expressly made these payments part of the consideration for the cession (and therefore part of the "payments made by the United States on the claim," to be deducted from the award under Section 2 of the Claims Commission Act, 25 U.S.C. § 70a). See Part II, infra. Similar payments to individual Indians, required by a treaty in consideration for a cession or other undertaking by an Indian group, have been held deductible as consideration. See Quapaw Tribe v. United States, 1 Ind.Cl. Comm. 644, 665–66 (1951), aff'd on this point, 128 Ct.Cl. 45, 55 (1954). The theory is that the tribe itself desired such payments to be made as part of the exchange for its land cession. Plaintiffs insist that these payments were really in the nature of bribes to obtain the treaty, but at best the evidence to that effect is miniscule; clearly the Commission did not have to draw such an inference.

As for the payment of the tribe's debts, the Commission had earlier held, on the same principle, that a treaty provision of this type constituted part of the consideration for a cession. Absentee Delaware Tribe v. United States, 9 Ind.Cl.Comm. 346, 357 (1961). The opinion below correctly found that result peculiarly appropriate here "where the Senate, in consenting to the ratification of the Treaty, required the examination by a commissioner of all debts for which payment was sought under the provision to pay debts of the Indians in order to exclude any found to be unjust." 38 Ind.Cl.Comm. at 218.[7]

7. The Senate reservation provided (7 Stat. 447–48, Note) that debtors were to be paid only the sums found by the commissioner to be justly due them, "in no instance increasing the sum agreed to be paid." 7 Stat. 447, Note. Any monies saved by deduction or disallowance of the debts were to be paid to the Indians.

8. The same section also calls for mandatory deduction "for all other offsets, counterclaims, and demands that would be allowable in a suit brought" by an Indian group in this court. In addition, the Commission has discretionary authority ("if it finds that the nature of the claim and the entire course of dealings and accounts between the United States and the claimant warrants such action") to offset gratuitous ex-

II

*Defendant's cross-appeal*

A more serious issue comes to us on the Government's cross-appeal. We noted in Part I, C, supra, that Section 2 of the Indian Claims Commission Act, 25 U.S.C. § 70a, provides that "[i]n determining the quantum of relief the Commission shall make appropriate deductions for all payments made by the United States on the claim * * *."[8] By Act of Oct. 27, 1974, Pub.L.No.93–494, 88 Stat. 1499, (codified at 25 U.S.C. § 70a (1970)), Congress added the proviso "That expenditures for food, rations, or provisions shall not be deemed payments on the claim." In this case the Commission found that, under the 1833 treaty and supplementary articles, the United States spent $516,606.65 (as part of the consideration for the cession) for food, rations, and provisions which the 1974 law made nondeductible from the grand total of the "payments on the claim." In its appeal defendant urges that the Ind.Cl.Comm. misconstrued the 1974 Act to include the consideration promised and given under the treaty by the United States. That amendment, the Government argues, is limited to payments unilaterally made by the United States after a claim is brought forward, apart from any consideration paid (for a cession or undertaking by the Indians) under a treaty or agreement. Defendant's position is, therefore, that the $516,606.65 for food, rations, and provisions should have been included in the deductions from the award, along with the other sums offset.[9]

penditures by the Federal Government—except that Congress has specified certain types of gratuities which shall not be offset at all.

9. Defendant does not contend in this court that the $516,606.65 figure covered more than "food, rations, or provisions." The issue here centers solely on the meaning of "payments on the claim" in the 1974 proviso.

Before the Commission the parties did not litigate the coverage of that proviso. Plaintiffs argued that the more-than-half-million dollar sum was non-deductible regardless of the proviso (that contention is still preserved in this court), and the defendant responded to that position. The Commission *sua sponte* import-

It has become an axiom in interpreting legislation that it is well to start with the words of the statute though one may not stop there. Here, if one puts aside the legislative history and background of the 1974 proviso, the normal, spontaneous reading of "payments on the claim" would cover consideration (if paid) for a land transfer embodied in a treaty of cession. If such consideration paid by the United States was less than the value of the property, it would ordinarily be thought of as a partial "payment on the claim," to be taken into account in calculating the final award.[10] Over all the twenty-odd years prior to the 1974 amendment, the Commission regularly deducted treaty-prescribed consideration (if paid) from its award of the value of ceded land (or other property) to the extent the award was more than the consideration—and that seems to have been done under the original provision for mandatory deduction "for all payments made by the United States on the claim," since there is and was no separate provision for offset of "consideration."[11] "Payment on the claim" was, it is plain to us, the normal statutory basis for the deduction of "consideration payments," as well as other types of payment relating to the claim on which suit was brought.[12]

Thus, the problem emerges not from the language of the 1974 proviso, but from its legislative history. The most significant portion of this is the August 1974 Hearing before the House Subcommittee on Indian Affairs.[13] Several strains run through this

ed the 1974 amendment into the case, holding it applicable. The opinion said (38 Ind.Cl.Comm. at 224): "Although there is some ambiguity in the language of the amendment and its legislative history as to whether 'payments on the claim' are to be deemed synonymous with or include 'consideration,' our present judgment as to the intent of Congress is that such forms of payment are not to be credited against our awards whether or not there exists a refined distinction between consideration and payments on the claim."

10. Before the Indian Claims Commission Act was passed, the Supreme Court said: "Payment upon a claim means payment on account or in part as distinguished from one made and accepted as payment in full." *Klamath and Moadoc Tribes v. United States*, 296 U.S. 244, 251, 56 S.Ct. 212, 216, 80 L.Ed. 202 (1935).

11. For example, defendant itself cites in its reply brief, at 7–8, among a number of other Commission cases, the 1961 decision in *Cheyenne-Arapaho Tribes v. United States*, 10 Ind. Cl.Comm. 1, 37–61, in which the Commission deducted from its award a substantial sum in food, rations, or provisions as part of the Government's "consideration" for the Indians' undertakings.

In this very case, defendant, in the findings it proposed to the Ind.Cl.Comm. on the award, included the now challenged $517,000 (approx.) under its Proposed Finding No. 19, headed "Payments on the Claim"; it reserved the term "Consideration" for the Government's undertakings in the treaty, regardless of whether or not those undertakings were actually executed. Thus, the expenditures in fact made for food, rations, and provisions were characterized by defendant itself as "payments on the claim," at a time when the coverage of the 1974 ·proviso was not being litigated.

12. Defendant now suggests that the deduction of paid consideration could be justified separately under the statutory provision in 25 U.S.C. § 70a for deduction of "all *other* offsets, counterclaims, and demands that would be allowable in a suit" brought by the Indian group in this court under Title 28 (emphasis added). There are at least three objections to this proposal. The first is that this provision, rather than to be taken independently of "payments on the claim," throws light on the latter clause by suggesting that consideration-payments, one sort of legal offsets normally allowable in this court, are incorporated in "payments on the claim." The second difficulty is that this particular provision, if read separately, seems never previously to have been invoked alone, in this context, by the Ind.Cl.Comm. or the defendant. The third objection is the doubt that the cited provision, if taken separately, was intended to apply to offsets integrally related to a non-legal Indian claim which could *not* be brought in this court under Title 28—such as revision of a treaty for "unconscionable consideration" or a claim "based upon fair and honorable dealings that are not recognized by any rule of law or equity." The present case falls in that "non-legal" category.

13. *Amendments to the Indian Claims Commission Act: Hearings on H.R. 16170 Before the Subcomm. on Indian Affairs of the House Comm. on Interior & Insular Affairs,* 93rd Cong., 2d Sess. (1974) [hereinafter cited as *Hearings on* H.R. 16170]. It is unnecessary to set out in detail all the steps in the passage of Public Law 93–494, a measure mainly devoted to authorizing appropriations for the Indian Claims Commission, but also containing the new proviso to § 2 of the Claims Commission Act. Because of that statute's peculiar legisla-

hearing, some of which tend to support the Commission's reading below while others incline toward the defendant's current construction.

The undeniable impetus for the 1974 amendment was the Commission's decision on the so-called Sioux "Black Hills" claim. *See Sioux Nation v. United States,* 33 Ind. Cl.Comm. 151 (1974), *rev'd in part,* 518 F.2d 1298, 207 Ct.Cl. 234, *cert. denied,* 423 U.S. 1016, 96 S.Ct. 449, 46 L.Ed.2d 387 (1975). There the Commission held that an 1877 Act had unilaterally acquired (by eminent domain and, if not, as a result of less than fair and honorable dealings [14]) the Black Hills portion of the Sioux reservation, and also that the United States was entitled to offset as "payments on the claim" all expenditures on behalf of the Sioux made by the United States in fulfillment of the obligations assumed under the 1877 Act—including very substantial sums for food, rations and provisions. The Sioux felt that this offset holding could wipe out, or at least seriously erode, the award they would receive under the Commission's holding on liability. They sought legislation which would prevent this conclusion [15] and the 1974 amendment ultimately resulted. In one formulation, the issue in this court is how far, if at all, did Congress go beyond the Black Hills case itself.

There is some hint that the 1974 proviso should be strictly confined to the Sioux's Black Hills claim and that claim alone, but this reading is clearly not permissible. The amendment was deliberately framed in general terms,[16] and it was retained in that general form even though there were pointed proposals at the House hearings that the

Sioux problem could and should be handled by a special bill covering only that particular claim, rather than by an amendment applicable also to others. The representative of the Interior Department specifically said that the amendment would apply to pending claims other than those of the Sioux, *Hearings on* H.R. 16170, *supra* note 13, at 15, and opposed selecting the Sioux for special treatment "if there are others that have a valid claim of this sort," *Hearings on* H.R. 16170, *supra* note 13, at 17. *See Hearings on* H.R. 16170, *supra* note 13, at 16–17, 25, 27, 42. We think, therefore, that it would simply rewrite the 1974 statute to turn it into a private Act for the Sioux alone.

It is then said that, in any event the amendment should be applied only to cases just like the Sioux's Black Hills claim. In its decision in that case, 33 Ind.Cl.Comm. at 219, the Commission declared that the 1877 acquisition-by-statute of the Black Hills by the Federal Government was unilateral and not pursuant to any valid treaty or agreement; this meant, the opinion said, that whatever the Sioux received for this land was not "consideration" (which, in the Commission's view, requires a contractual relationship) but simply "payments on the claim." The defendant now takes this as a ruling that "payments on the claim" (in the statutory sense) and "consideration" are mutually exclusive, the former referring solely to unilateral, unbargained for payments by the United States. Though there is no support for this position in the Commission's decisions (*see supra* and *infra*), there is some help for it in *Hearings on*

tive course (spelled out in H.R.Rep.No.93–1446, 93rd Cong., 2d Sess. 3, *reprinted in* [1974] U.S. Code Cong. & Admin.News, p. 6118 (Conference Rep.)), there is very little formal history bearing on the proviso other than the *Hearings on* H.R. 16170. The other bits of relevant legislative history appear in S.Rep.No.93–863, 93rd Cong., 2d Sess. 1, *reprinted in* [1974] U.S.Code Cong. & Admin.News, pp. 6112–6115; H.R. Rep.No.93–1446, *supra*; and 120 Cong.Rec. 25681 (1974).

14. This court on review held that any eminent domain claim was barred by an earlier decision of the Court of Claims. *United States v. Sioux*

*Nation,* 518 F.2d 1298, 1305–06, 207 Ct.Cl. 234, 247–49, *cert. denied,* 423 U.S. 1016, 96 S.Ct. 449, 46 L.Ed.2d 387 (1975). The court was not asked to, and did not, disturb the holding as to fair and honorable dealings.

15. *See* S.Rep.No.93–863, *supra* note 13, at 1–5, for the Sioux' initial proposal to Congress.

16. The Sioux memorandum proposing it, *see* note 15, *supra,* says that it is "couched in general terms," although its objective was to help the Sioux.

H.R. 16170, *supra* note 13. The written statement filed by Chairman Kuykendall of the Commission, *Hearings on* H.R. 16170, *supra* note 13, at 44–45, seems to draw this distinction, and to say that the proposed bill would not affect the deduction of bargained for "consideration."[17] The same theme was echoed, though less clearly, by the chairman of the subcommittee, *Hearings on* H.R. 16170, *supra* note 13, at 16, 24, 25, but the Justice Department representative (who opposed the bill) told the Congressman flatly there was no relevant difference between consideration and payments on the claim, *Hearings on* H.R. 16170, *supra* note 13, at 24, that "[l]egally, there is no distinction between these two," and that "they are both deducted from the award on the same terms," *Hearings on* H.R. 16170, *supra* note 13, at 25. At the hearings the Justice position clearly was that food, rations, and provisions given as treaty consideration would be covered by the proposed proviso. *See Hearings on* H.R. 16170, *supra* note 13, at 18, 20, 25. The Interior Department (which favored the legislation) also seems to have had the same understanding. *Hearings on* H.R. 16170, *supra* note 13, at 1–2, 11.

Reversing its position, the Department of Justice now relies on the distinction apparently drawn in Chairman Kuykendall's written statement, and bolsters its present view by the fact that the Commission told the subcommittee that, if the proposed "food, rations, or provisions" proviso had been in the Claims Commission Act from the beginning it would have barred only about $100,000 in deductions up to 1974 and, aside from the Sioux claim, would have only "minimal" or "insignificant" effect in the future. *See Hearings on* H.R.16170, *supra* note 13, at 15, 17, 24, 29, 31, 38, 45, 47–48. Defendant says that unless "consideration" payments are excluded—as it now urges—it would be impossible to come up with the small figure of $100,000 for pre-1974 effect, or use the characterization "minimal" or "insignificant" for future impact. That appears to be true for the past; $100,000 would be far too small if "payments on the claim" covered past consideration expenditures for food, rations, and provisions, as well as purely unilateral payments for the same purpose. With respect to future effect, the use of "minimal" is more arguable; in the light of the Sioux payments for food, rations, and provisions, estimated to be from $30,000,000 to $57,000,000, *see Hearings on* H.R. 16170, *supra* note 13 at 19, 36, 39, the present challenged deduction of some $517,000 plus the others we now know

---

**17.** In pertinent part, this statement said:

" * * * we must analyze three types of payments made by the United States to the Indian tribal claimant and for which the Government may obtain credit or have deducted from a monetary award to such claimant. They are known as (1) consideration, (2) payments on the claim and (3) gratuities or gratuitous offsets.

The first one, "consideration," is not truly an offset. In the typical land cession case the United States paid something in money, lieu lands, or goods, for the ceded land in accordance with the treaty or agreement it had made with the Indian tribe. The Commission tests the conscionability of the transaction by comparing the then fair market value of the land with the amount of consideration paid. If the transaction is determined to be unconscionable because the treaty consideration is so grossly less than the value of the ceded land, the Indian claimant is entitled to an award of the difference between the two sums, but the consideration paid by the United States is credited against the gross fair market value to determine the net award to the plaintiff tribe. It is inherent in a conscionability claim that credit will be given for the consideration paid in order to reach a fair result. *It is our understanding that there is no proposal before the Congress to change the existing practice of crediting consideration paid* [emphasis added].

"Payments on the claim" are those sums, goods and services provided to the tribe by the United States in response to a claim or grievance asserted by the tribe. As distinguished from consideration, payments on the claim are made unilaterally by the United States not because of any treaty obligation to do so, but in acknowledgment by the Government that some compensation is due the tribe for past specific cases. Such payments are usually authorized by statute. Like consideration, but unlike gratuities, Sec. 2 of our Act as it stands, requires that payments on the claim be deducted from any award to the Indian tribal claimant. Payments on the claim have appeared rather rarely in Indian claim litigation, and usually have consisted of money or land given to a tribal claimant rather than food or provisions. * * * "

about could be said to be "minimal" or "insignificant" on a comparative scale.[18]

■ This legislative history is certainly ambiguous, as the Commission noted below, 38 Ind.Cl.Comm. at 224, and we have concluded that, everything considered, the Commission was correct in refusing to separate out and exclude "consideration" payments of food, rations, and provisions from the coverage of the 1974 proviso. The normal understanding of the language would cover both, as we have pointed out, and to overcome such a normal reading the showing from legislative history or legislative purpose must be persuasive. *See National Labor Relations Board v. Plasterers' Union*, 404 U.S. 116, 129 n. 24, 92 S.Ct. 360, 30 L.Ed.2d 312 (1971); *United States v. Dickerson*, 310 U.S. 554, 562, 60 S.Ct. 1034, 84 L.Ed. 1356 (1940); *United States v. American Trucking Ass'ns*, 310 U.S. 534, 543–44, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940). We do not find such persuasiveness here. The distinction drawn at the hearings by the Commission chairman between "consideration payments" and "payments on the claim" had not previously appeared in the Commission's decisions,[19] and though it seems to have been accepted at the hearing by the House subcommittee's chairman there is little or no indication that it was adopted by the other members of the subcommittee or that it was communicated in any understandable fashion to the full House committee, to the conference committee, or to the membership of the full House and Senate. The distinction was not accepted or pushed, while the bill was going through the Congress, by either of the two executive departments most interested in Indian affairs (Justice and Interior), one of which opposed the measure while the other supported it.

Moreover, there seems to be only the weakest of policy reasons for differentiating, insofar as food, rations and provisions are concerned, between so-called consensual "consideration payments" and non-gratuitous unilateral payments by the Federal Government. If humanitarian impulses preclude the Government from collecting from the Indians for feeding and sustaining them when such expenditures are made by the United States, on its own, sometime after a cession of the Indian tract previously used for sustenance, then it would seem most peculiar to treat differently with sustenance payments promised in the same treaty which transfers the land to the Government. It is said in support of the distinction that in the case of "consideration payments" there would at least be participation and bargaining by the Indians for the food, rations, or provisions, but that supposed difference pales into nonexistence in the many cases in which any "bargaining" was decidedly one-sided—such as a case (like this) under Section 2(3) of the Claims Commission Act, 25 U.S.C. § 70a, where a treaty is being revised for "unconscionable consideration," or where fraud, duress, or mistake is involved, or where there is a claim under Section 2(5) based on less than fair and honorable dealings.

---

18. The H.R.Rep.No. 93–1446, *supra* note 13, at 3, refers to the fact that the House of Representatives had originally been unwilling to agree to the "food, rations, or provisions" amendment without holding a hearing, "inasmuch as the cost of such an amendment to the Indian Claims Commission Act could approach $100 million." If the figure of "$100 million" relates to the amount thought to be involved in the *Sioux* case, the level of "minimal" for other cases would obviously be higher on a comparative basis; if however, "$100 million" refers significantly to other cases (as well as the *Sioux's*) it likewise shows that "minimal" was probably not used in the absolute sense of trivial or very small.

19. The *Sioux* decision, *supra*, 33 Ind.Cl.Comm. at 219, and the other opinions cited by defendant (*Prairie Band of Pottawatomie Tribe v. United States*, 33 Ind.Cl.Comm. 394, 404 (1974); *Nez Perce Tribe v. United States*, 24 Ind.Cl.Comm. 429, 433–34 (1971)), merely pointed out that "consideration" required a consensual element; they did not hold or suggest that "consideration payments" could not also be "payments on the claim," or that the two terms were mutually exclusive.

It is worth noting that the chairman of the Commission, who filed the written statement with the House subcommittee, joined in the opinion below which we are asked by the Government to reverse with respect to the 1974 proviso.

The biggest obstacle, in the legislative history, to accepting the normal meaning of the language of the 1974 amendment is the repeated belief, expressed at the House subcommittee hearings, that the amendment would have cost the Government, aside from the *Sioux* case, only $100,000 in the past (and would have only "minimal" impact for the future). The $100,000 figure is clearly too small if the broader reading is adopted but might well be correct if one accepts the sharp distinction between "consideration payments" and other "payments on the claim."[20] But there is little or no indication that anyone in Congress, aside perhaps from the chairman of the subcommittee, understood the presumed basis of this monetary estimate, and therefore there is little ground for inferring that Congress as a whole desired the narrow reading. In other words, while it is obvious that Congress thought that (aside from the *Sioux* case) the 1974 proviso would not cost too much, there is no good reason to think that Congress understood that the figures supplied to it excluded "consideration payments." Congress as a whole may very well have thought that "consideration payments" for sustenance plus other comparable "payments on the claim" would not amount to much *in toto*. In the absence of some strong inference which may properly be drawn as to the intended scope of a piece of legislation from the type of information given to Congress, the reading of a statute should not be distorted by the courts simply because incorrect information was supplied. If Congress feels that it was misled or misinformed as to cost or other factors, it can change the legislation.

Because, for these reasons, the legislative history does not convince us to depart from the normal interpretation of the words of the 1974 proviso, we accept that reading as correct and affirm the Commission's ruling which excluded from allowable offsets, under the 1974 amendment, some $516,606.65 in "consideration payments" to the Indians for food, rations, and provisions.[21]

In all respects appealed from, the decision of the Indian Claims Commission is *Affirmed*.

NICHOLS, Judge, concurring:

I join in Judge Davis' opinion and in the judgment of the court. As to the cross-appeal, I would like to say that I would find the issue even more difficult than it is, but for a factor not mentioned in the opinion. Congress was clearly concerned as to the bogging down of the *Sioux* case or cases in factual investigation of minutiae of insufficient importance to justify the time lost and the auditors' pay. The Senate Committee said, 3 U.S.Code Congressional and Administrative News (1974), pp. 6111, 6115, that the computation of an offset for feeding the Sioux, if allowed, would "take 5–15 men working at least a year (and probably longer) . . . and even then the absence of necessary data may prevent the preparation of a complete and fully accurate report." This of course relates to the *Sioux* cases and not others, but the Committee plainly indulged in the presumption that the problems manifest in the *Sioux* cases might arise in others. It declined to enact special legislation for the Sioux alone. In effect, the problems of their cases were taken as models of others about which no information was obtained, except for generalizations that may have been mistaken. As Judge Davis says, we cannot correct Con-

---

**20.** We have already said that "minimal" is too comparative a word for us to tell whether or not it was an improper forecast. *See* text and note at note 18 *supra*. At one point in the hearings, *Hearings on* H.R. 16170, *supra* note 13, at 23, the chairman of the subcommittee indicated that it would probably be "less than $2 million in the future." From what we now know, we cannot say that that is a wholly illusory prognosis of the total future cost of the 1974 amendment as we now construe it.

**21.** We need not, and do not, pass upon the other grounds put forward by the Indians for affirming the Commission's action deducting the $517,000—apart from the 1974 proviso. *See* note 9, *supra* (second paragraph).

**48**

gress' factual errors. If the figure of almost $25,000,000, or more, estimated as the cost of feeding the Sioux, was significantly less in the cases of other Indian tribes but still substantial, the cost of accurate computation of the offset would be disproportionate to the amount involved and would delay final settlement to no useful purpose. It is not reasonable to believe that Congress, striking this blow for simplicity and speed of adjudication, would have wished to restrict its effect to instances duplicating the *Sioux* situation, for the cost of the computation and delay it caused would be disproportionate to the benefit of making it, whether the rations were furnished as "consideration," as "payments on the claims," or even as "gratuities." Thus the view originally put forward by Chairman Kuykendall, but later abandoned by him, would have almost entirely frustrated an object Congress sought to achieve. The computations in the instant case have been made, apparently, but there is nothing to show Congress meant this to make a difference, though clearly it was thinking primarily of instances when they had not.

In *United States v. Delaware Tribe of Indians,* 427 F.2d 1218, 192 Ct.Cl. 385 (1970) we had before us a Commission rule that it would ignore for offset purposes any gratuities in the nature of subsistence, etc., which in any year did not exceed five percent of the deficiency in the compensation previously paid the Indians for their lands, below what it should have been. We struck this down as an attempt to award interest, contrary to the applicable precedents. However, the parties made it clear that the Commission was also attempting to shed some of the burden of making insignificant calculations. There was much talk about the cost of a hypothetical sack of peanuts, as against the cost of tracking it down for audit purposes a century later. This we recognized as worthy of consideration, even though the cure adopted was incurably tainted. Congress has now acted in the premises and we should give its enactment all the effect the language permits.