**Robert L. HART**

v.

**The UNITED STATES.**

**Nos. 74-77, 263-77.**

United States Court of Claims.

Oct. 18, 1978.

John S. Brown, Boston, Mass., atty. of record for plaintiff; John H. Ashby, Boston, Mass., Francis A. Boyle, Cambridge, Mass., and Bingham, Dana & Gould, Boston, Mass., of counsel.

David C. Hickman, Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington, D. C., for defendant; Theodore D. Peyser and Robert S. Watkins, Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, and DAVIS, NICHOLS, KASHIWA, KUNZIG, and BENNETT, Judges, en banc.

## ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

NICHOLS, Judge.

This case is before the court on cross-motions for summary judgment. Taxpayer seeks a refund of income taxes paid in calendar years 1967 and 1968, based on a credit for foreign taxes. The issue is whether plaintiff's claim for refund was timely filed. Defendant contends that the election or choice to claim a credit for payment of foreign taxes under Internal Revenue Code section 901(a) must be made within three years from filing of the return (or two years from payment, if later), as required by Code section 6511(a); plaintiff argues that section 6511(d)(3)(A), providing a special ten year period, supersedes section 6511(a). Under defendant's construction, plaintiff's election of the foreign tax credit was untimely, even though had he elected within three years, he could have claimed an increase in the credit within ten. There is no triable issue of fact. We hold, however, that the special ten year statute of limitations applies to the election as well as the increase of the foreign tax credit, and grant plaintiff's motion for summary judgment.

Plaintiff first established his residence in Australia in 1967, and has lived there ever since, acquiring Australian citizenship by naturalization in 1971. For calendar years 1967–70 taxpayer filed U.S. tax returns and timely paid his income taxes. He also filed Australian income tax returns for the same period, and paid Australian income taxes. On his United States tax return in 1967, plaintiff took a deduction with respect to foreign income taxes withheld on foreign source dividends. He did not claim this deduction, or a credit with respect to foreign taxes, on his 1968 return.

In 1971 it was determined that the Australian income tax returns for the years 1968–1970 contained errors. In 1972 plaintiff filed amended Australian returns, reflecting an increased tax liability for each

of those years. In 1973, the Australian tax authorities issued notices of amended assessments for the years 1968 and 1969, and a notice of assessment for 1970, and plaintiff duly paid the additional taxes owed. Also in 1973, plaintiff filed amended United States income tax returns for calendar years 1968–70. On November 10, 1976, plaintiff filed an amended United States return for calendar year 1967. On all of these returns he elected foreign tax credits under section 901 for the Australian income taxes he paid or owed. He also carried back to 1967, under section 904(c), excess foreign taxes paid in 1969. There are similar carrybacks to 1968 of excess foreign taxes paid in 1969 and in 1970.

The Internal Revenue Service allowed plaintiff's 1969 refund claim in full, deeming it filed within the general three year period of section 6511(a). The 1968 claim was disallowed in full because not made within the aforesaid three year period. Apparently no action has yet been taken with respect to the 1967 claim.

The Code sections which are offered for our interpretation are sections 901 and 6511. Section 901 offers taxpayers the alternative of taking a credit for foreign taxes in lieu of a deduction under section 164(a). In pertinent part section 901 provides:

(a) Allowance of credit.

If the taxpayer chooses to have the benefits of this subpart, the tax imposed by this chapter shall, subject to the applicable limitation of section 904, be credited with the amounts provided in the applicable paragraph of subsection (b) plus, in the case of a corporation, the taxes deemed to have been paid under sections 902 and 960. Such choice for any taxable year may be made or changed at any time before the expiration of the period prescribed for making a claim for credit or refund of the tax imposed by this chapter for such taxable year. * * *

This credit is limited in amount for any one year to the same proportion of tax as the foreign taxable income bears to total taxable income. To this effect, section 904 provides as follows:

(a) Limitation.

The total amount of the credit taken under section 901(a) shall not exceed the same proportion of the tax against which such credit is taken which the taxpayer's taxable income from sources without the United States (but not in excess of the taxpayer's entire taxable income) bears to his entire taxable income for the same taxable year.

If the foreign taxes paid or accrued exceed the limitation of subsection (a), the excess may be carried back two years, and then carried forward for up to five years. Section 904(c). Use of the carryback and carryover is limited to those taxpayers who timely elect the foreign tax credit under section 901.

To make a timely election of the credit the taxpayer must indicate his choice within the limitations period prescribed in section 6511. Generally, for one claiming a credit or refund, the applicable period is that of section 6511(a):

(a) Period of limitation on filing claim.

Claim for credit or refund of an overpayment of any tax imposed by this title in respect of which tax the taxpayer is required to file a return shall be filed by the taxpayer within 3 years from the time the return was filed or 2 years from the time the tax was paid, whichever of such periods expires the later, or if no return was filed by the taxpayer, within 2 years from the time the tax was paid. * * *

Section 6511 contains a number of exceptions to the general rule, however. Among these is subsection (d)(3)(A):

(3) Special rules relating to foreign tax credit.

(A) Special period of limitation with respect to foreign taxes paid or accrued.

If the claim for credit or refund relates to an overpayment attributable to any taxes paid or accrued to any foreign country or to any possession of the United States for which credit is allowed against the tax imposed by subtitle A in accordance with the provisions of section 901 or the provisions of any treaty to

which the United States is a party, in lieu of the 3-year period of limitation prescribed in subsection (a), the period shall be 10 years from the date prescribed by law for filing the return for the year with respect to which the claim is made.

In essence, plaintiff argues that the special ten year period altogether pre-empts section 6511(a) and applies across the board to the decision to claim a credit for foreign taxes paid or accrued. Defendant replies that the special ten year period is available only for the purpose of adjusting the size of the credit. Otherwise, the taxpayer's initial choice to take a credit must be made (or changed) within the three year period of section 6511(a). Current Treasury regulations adopt the Service's interpretation:

> The taxpayer may, for a particular taxable year, claim the benefits of section 901 (or change his choice if previously made) at any time before the expiration of the period prescribed by section 6511(a) * * for making a claim for credit or refund of the tax imposed by chapter 1 for such taxable year. Such period for such taxable year is determined without regard to the special period prescribed by section 6511(d)(3)(A). Treas.Reg. § 1.901–1(d) (1964).

Since the validity of this regulation depends on whether its interpretation of the statute is correct, we need not mention it further. *See also* Rev.Rul. 63–248, 1963–2 C.B. 623; Rev.Rul. 56–196, 1956–1 C.B. 655.

Just on the bare language, without reference to the legislative history or to the administrative regulations, we adhere to the view that the "normal reading" of sections 901 and 6511 alone does not reveal a requirement that the election to take a credit be made within three years. We so held in *Bank of America v. United States*, 377 F.2d 575, 180 Ct.Cl. 111, (1967). Under section 901 the choice to take the credit must be made prior to the expiration of the period prescribed for claiming a refund of the tax paid for the taxable year. The taxpayer must then refer to section 6511 to determine the relevant period. Although section 6511(a) provides a general rule allowing three years to claim a refund, this section contains seven special rules applicable to income taxes as well. It is explicitly stated in section 6511(d)(3)(A) that the ten year period is "in lieu of the 3-year period of limitation * * *." Such special rules following general ones are common in the Internal Revenue Code and it need not be spelled out that the general rule is pre-empted. Section 6511(d)(3)(A), quoted *supra*, is couched in broad terms; it certainly does not state that the ten year limitations period applies only to adjustments in the size of the credit. Reading section 6511 as a whole, the natural inference, then, is that Congress intended subsection (d)(3)(A) where it applies to substitute entirely for subsection (a). We have recently noted that the "normal understanding of the bare language is not conclusive but it is entitled to prevail unless overcome by a persuasive showing from the purpose or history of the legislation." *Aparacor, Inc. v. United States*, 571 F.2d 552, 554, 215 Ct.Cl. 596, 600 (1978), citing *Prairie Band of the Pottawatomie Tribe of Indians v. United States*, 564 F.2d 38, 46, 215 Ct.Cl. 1, 15 (1977). There is nothing absurd in our construction. Rather, it seems necessary to allow for late and retroactive assertion of additional tax liability by foreign states, as Congress wished to do. On oral argument, counsel for defendant admitted he could suggest no reason why Congress should wish to distinguish between an election and an adjustment in the size of the credit.

We further believe that the "normal understanding of the [bare] language" that is entitled to prevail does not necessarily exclude all possibility of an alternative reading that refined and subtle legal analysis might invent. Ambiguity in a statute, regulation, or contract, necessitating resort to legislative history and other extrinsic aids, normally means two or more alternative readings, all having some claim to respect and none leading to absurd results. With exceptions, the extent of which are at issue here, extrinsic aids are not resorted to in order to raise difficulties where none really exist in the bare language, where one reading is so much to be preferred that no

need is felt to go beyond it to extract the intent of the legislature elsewhere. Such language is fairly characterized as unambiguous and we so characterize the language to be construed here. This is a case where legislative history is brought in to raise a difficulty concerning language that, taken by itself, would suggest none. At least, such legislative history ought to be clear and convincing in its revelation of legislative intent.

The question for us to resolve, therefore, is whether the legislative history persuades us to read into the statute a requirement that the election to take a credit must be made within three years. The parties have offered extensive portions of this history in support of their respective positions. At this juncture, then, a review of this material is appropriate to see whether it contains anything to rebut the "normal understanding of the [bare] language."

The earliest forerunner of section 901 appeared in the Revenue Act of 1918. The purpose of allowing the credit was to avoid the inequity of double taxation of foreign source income. It was reenacted in subsequent Revenue Acts, and became section 131 of the 1939 Code. In 1942 the foreign tax credit was amended to allow the choice of a credit or deduction to be made or changed at any time within the limitation period, then three years. Several years later bills were introduced into Congress lengthening the limitations period to seven years. The impetus for this proposal was concern over inequities arising from the ability of the Service to assess additional income taxes whenever a taxpayer received a refund of foreign taxes, no matter when that refund was received, while the taxpayer was barred from asserting a claim for refund of United States income taxes when foreign taxes were assessed or increased after the three year period from the date of filing. Although none of these bills, which appeared in the late 1940's, were actually enacted by both houses of Congress, the 1954 Code included section 6511(d)(3)(A), extending the limitations period to ten years from the date of filing. We note that after this was enacted in 1954 even the

Service construed it as permitting a ten year period for making the election of the credit, as well as for adjusting it. Its mind was apparently changed for it by the Joint Committee on Internal Revenue Taxation, as recited in *Bank of America, supra.*

The source of the present controversy, then, is statements made in committee reports accompanying the Act of September 14, 1960, Pub.L.No. 86–780, 74 Stat. 1010. The Act itself amended the second sentence of section 901(a), adding the words "for any taxable year," changing the words "prior to" to "before," adding the words "imposed by this chapter," and deleting the words "against which the credit is allowable." Defendant suggests no way in which these petty changes could be construed to change the previous meaning in any way relevant to the instant controversy. In *Bank of America, supra,* we held that they were so slight as to appear insignificant, 377 F.2d at 579, 180 Ct.Cl. at 118. In an appendix at the end of the opinion we have reproduced a chart prepared by plaintiff comparing the new language with the 1942 and 1954 predecessors. We note that in 1960 there was no alteration of section 6511.

There is, however, a passage in the Committee Reports which is relied on heavily by the defendant as supporting its argument that the ten year period is available only when the election to take a credit has been made within three years after filing the return for the year in question. This passage is contained in both the Senate and House Committee Reports as part of the "Technical Explanation of the Bill." We quote it in its entirety:

> Time for choosing between credit and deduction.—Subsection (b) of section 3 of the bill amends the second sentence of section 901(a) of the 1954 Code to *make it clear* that the choice as to whether to take a foreign tax credit for any taxable year, or to take the foreign taxes as a deduction for such year, must be made or changed before the expiration of the period prescribed for making a claim for credit or refund of the tax imposed for

such taxable year by chapter 1 of the 1954 Code. This period will usually expire at the time prescribed by section 6511(a) (generally 3 years from the time the return was filed). If, however, the time for filing such a claim for credit or refund is extended by agreement (as provided under sec. 6511(c)), then the time for making the choice as to claiming a credit or a deduction for foreign taxes will extend to the expiration of the time agreed upon.

It is to be noted that the period prescribed by the second sentence of section 901(a) is not extended by section 6511(d)(3). Section 6511(d)(3) provides, in effect, a 10-year period of limitation for claims for credit or refund of overpayments attributable to foreign taxes. However, for this 10-year period to be applicable, the choice to take the foreign tax credit (in lieu of the deduction) must have been timely made (that is, made within the time prescribed by the second sentence of sec. 901(a)).

In applying the second sentence of section 901(a) in a case where a carryback or carryover of taxes under section 904 is involved, the taxable year which is determinative of the period for making the choice between a credit and a deduction is the taxable year from which the excess taxes may be carried (and not the taxable years to which they may be carried). In addition, the excess taxes for such taxable year may not be used as a credit in another taxable year to which carried unless the taxpayer chose to take a credit (rather than a deduction) for such other taxable year within the period prescribed by the second sentence of section 901(a) for making the choice for such other taxable year. S.Rep. No. 1393, 86th Cong., 2d Sess. 15–16 (1960) (emphasis supplied). *Accord*, H.R.Rep. No. 1358, 86th Cong., 2d Sess. 11–12 (1960); U.S.Code Cong. & Admin.News 1960, pp. 3770, 3784.

In a similar vein, the House Report also states, as part of the section analysis:

The bill also provides that the choice to take the foreign tax credit in lieu of the deduction, * * * must in general be made or changed within the 3-year statute of limitations * * * and not within the special 10-year statute provided by section 6511(d)(3)(A). The bill provides that for periods to which the 1954 Code is applicable (generally the calendar year 1954 and subsequent years) this 10-year statute is to be available only for purposes of determining the size of the credit, and not for purposes of making, * * * a choice between a deduction or credit.

* * * Also as indicated above, the bill provides that generally the 3-year statute, but in no case the 10-year statute, is to be available for choices between the selection of the deduction or credit, * * * for taxable years beginning after December 31, 1953 and ending after August 16, 1954. H.R.Rep. No. 1358, 86th Cong., 2d Sess., 1960–2 C.B. 865, 869.

The Senate Report contains nearly identical language. S.Rep. No. 1393, 86th Cong., 2d Sess., 1960–2 C.B. 874, 880.

The first and most obvious comment is that these statements contradict the plain language of the statute they purport to relate to. It seems obvious that, under the Constitution, Congress must legislate in bills enacted in proper form and presented to the President for signature. To legislate by committee report would raise a constitutional problem at least as serious as the current one about the one-house veto. For such a contradictory report to have weight, therefore, we believe that even though contradictory, it must afford persuasive indication on its face that its authors believed they were fairly construing the statute as enacted, not amplifying, amending, or correcting it.

We examined the legislative history of the 1960 Act in *Bank of America, supra*, in a different context. The Bank of America sought refunds based on foreign tax credits for years before 1960. The decisive issue in this case was seen as whether the Act, if it really changed the limitations period, could be applied retroactively to pre-1960 years. After finding that before 1960 the law un-

ambiguously allowed ten years within which to elect the credit, the court refused to apply the 1960 legislation retroactively. The holding was explicitly limited in scope: whether or not the 1960 amendment altered the law, it could not be applied to pre-1960 tax years. The court did not determine what prospective effect should be accorded the alterations to section 901 because it was not necessary to reach that issue.

In concluding that before 1960 the law provided a ten year limitations period for election of the foreign tax credit, this court relied both on the statutory language and the legislative history to the 1954 Code. In this regard the court stated:

> So if we had only the 1954 language and history of section 901 before us, we would have little difficulty in reading the statute to allow 10 years to change a choice— particularly in view of the administrative policy. The difficulty is obviously presented by the 1960 Act and history, including the subsequent regulations. The 1960 changes in the original language of section 901 are so slight that they appear to be insignificant; it would seem that if the 10-year period was applicable before 1960, it should be applicable after. However, it may be significant that changes were in fact made, and resort to the legislative history may be warranted for this reason. The legislative history, of course, rebuts our interpretation of the pre-1960 law. Analytically, it would be possible to decide that in the light of the legislative history, the apparently insignificant language changes effected a change (as contrasted with a clarification) in the "old" law, so that after 1960, choices must be within the 3-year period. * * *
>
> * * * We are of the view that the 1954 law gave taxpayers the 10-year period to choose, and that the 1960 Congress was incorrect if it interpreted the earlier law otherwise. * * * 377 F.2d at 579–80, 180 Ct.Cl. at 118–19.

Although no other court, so far as we are aware, has directly confronted the question of how to construe the 1960 amendments for post-1960 tax years, at least one court has bluntly indicated that it would apply the ten year period:

> The Government contends that the refunds in question were erroneously made as a matter of law because they were made after the expiration of the applicable period of limitation. * * * Whether this contention is correct depends on whether the limitation in § 6511(a) or that in § 6511(d)(3)(A) is applicable. Were this question before the Court, it would conclude that taxpayers are correct when they contend that § 6511(d)(3)(A) is the applicable limitation. *United States v. Woodmansee*, 388 F.Supp. 36, 45 n. 27 (N.D.Cal.1975).

On appeal of this case, the Ninth Circuit on July 2, 1978 (slip op.) has held that the ten year period applied without formal election to the case before it, where the taxpayer had no non-exempt U.S. income from which to effect a deduction, reversing the holding on other grounds of the court below. *Morrison-Knudsen Co. v. United States*, 68–2 U.S.T.C. ¶ 9612 (N.D.Cal.1968) involved pre-1960 tax years; the court applied a ten year statute of limitations to allow the foreign tax credit. The opinion is not qualified in its acceptance of the ten year period as is our *Bank of America* decision. Both of these cases, at least to some extent, support the continued application of a ten year period, particularly to the extent that the 1954 law was allegedly clarified, and not revised by the 1960 enactment.

We now, of course, reach the question left open by *Bank of America*. On reviewing the legislative history we believe that the committees really were expressing their opinion in regard to the meaning of the 1954 law, and not amending the statute to reflect its present intent as of 1960 that a three, rather than ten, year period prevail. As the court noted in *Bank of America*, Congress (really the committees) itself characterized the amendments as a "clarification" of the existing law, rather than as an "alteration" of the limitations period. Any Congressman who before voting compared the reports with the changes actually made,

would have seen that the 1960 enactment made no change such as the report seemed to say it did. This interpretation is reinforced by the very fact that they assumed the three year period would apply as of the date of the 1954 Code. Presumably, as the court recognized, Congress would not deliberately shorten the limitations period retroactively. Because amendments to section 901 allegedly operate simply to clarify existing law, the comments accompanying these rather insubstantial word changes are not binding on the court. The courts have consistently stated that expression of opinion by a subsequent Congress on the meaning of an act adopted by an earlier Congress have little, if any, significance. In effect, such statements represent an attempt to usurp the role of the judiciary in interpreting the intent of the 1954 Congress and the meaning of the 1954 enactment. *See generally United States v. Southwestern Cable Co.,* 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968); *United States v. Price,* 361 U.S. 304, 312–13, 80 S.Ct. 326, 4 L.Ed.2d 334 (1960); *Humble Oil & Refining Co. v. United States,* 442 F.2d 1362, 1369, 194 Ct.Cl. 920, 932 (1971). Moreover, if the meaning of the legislation was not modified by the 1960 amendment, to apply a post-1960 three year limitations period would effectively overrule *Bank of America,* which we decline to do.

Defendant argues that regardless of whether the amendment was termed a "clarification" of or a "change" in the law, this court should interpret it in such a way as to effectuate the 1960 intent of Congress. This intent, according to defendant, was specifically stated to be the prevention of electing the credit after the three year statute of limitations has run. Thus, defendant suggests that even if the literal language of the involved sections does not achieve this result, we should nevertheless interpret the insignificant alterations in the second sentence of section 901 as having this effect.

"The starting point in any case involving construction of a statute is the language itself." *St. Paul Fire & Marine Insurance Co. v. Barry,* —— U.S. ——, ——, 98 S.Ct. 2923, 2930, 57 L.Ed.2d 932 (1978) (rejecting attempt by Court minority to enlarge the scope of an antitrust exemption by citation of legislative history). The Supreme Court has also recently reiterated that "[w]hen confronted with a statute which is plain and unambiguous on its face, we ordinarily do not look to legislative history as a guide to its meaning." *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 184 n. 29, 98 S.Ct. 2279, 2296, 57 L.Ed.2d 117 (1978), *citing Ex parte Collett,* 337 U.S. 55, 61, 69 S.Ct. 944, 93 L.Ed. 1207 (1949). On the other hand, however clear the statute may appear on its face, the Court has also observed that there certainly is no rule of law forbidding a court from resorting to legislative history to determine the intent of Congress. *Train v. Colorado Public Interest Research Group, Inc.,* 426 U.S. 1, 9–10, 96 S.Ct. 1938, 48 L.Ed.2d 434 (1976); *Cass v. United States,* 417 U.S. 72, 77–79 (1974); *United States v. American Trucking Ass'ns,* 310 U.S. 534, 543–44, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940). We assume for purposes of this opinion that the *Train* case is still law and requires us to consider the history to the extent that it really is persuasive, but we must view that history also with skepticism rather than credulity.

In essence, this case presents the dilemma of choosing between conflicting legislative history and statutory terms. It is, of course, not unheard of for a court to implement the legislative history, rather than a literal construction of the statutory wording, in order to give effect to the perceived purpose of the legislation. For example, in *Church of the Holy Trinity v. United States,* 143 U.S. 457, 36 L.Ed. 226 (1892), the Supreme Court refused to apply a literal interpretation of a statute which unambiguously prohibited the importation of foreigners and aliens under contract to perform service in the United States, to a contract between a British minister and an American church, which had engaged his services as a rector. The Court concluded that although the statute was by its terms broad

enough to apply, the intent of Congress was to reach the importation of uneducated physical laborers, and not to discourage the employment of alien professionals. Thus, the court fashioned a more narrow construction of the words of the statute than the normal reading would support. The language of the statute was overbroad, always an easy error to fall into.

*Holy Trinity* has been in a way everyone's favorite case, and it has been often cited in this court. It is also much discussed in the recent "snail darter" case in the Supreme Court, *Tennessee Valley Authority v. Hill, supra*. In the majority opinion, the portion binding on us, it is stated, 437 U.S. at 187, n. 33, 98 S.Ct. at 2298 that *Holy Trinity* is applied only in "rare and exceptional circumstances * * *. And there must be something to make plain the intent of Congress that the letter of the statute is not to prevail." *Citing Crooks v. Harrelson*, 282 U.S. 55, 60, 51 S.Ct. 49, 50, 75 L.Ed. 156 (1930). In that case the Court also said the "absurdity [of the literal text, if followed] must be so gross as to shock the general moral or common sense." As regards the "something to make plain the intent of Congress * * *," there was in *Holy Trinity* some direct committee interpretation, but the bulk of the material relied on showed the evil the Act to be construed was aimed at and what Congress meant to accomplish. Thus the committee's words as to how it expected the Act to be interpreted, 143 U.S. at 464, did not stand, as the corresponding committee words do here, as unsupported bald assertions. And here it is not the literal interpretation that produces the absurd result.

The Court has ordinarily expressed a wary attitude in dealing with legislative history invoked by one seeking to expand the literal scope of an Act. For example, in *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 26, 97 S.Ct. 926, 941, 51 L.Ed.2d 124 (1977), the Court noted that "[r]eliance on legislative history in divining the intent of Congress is, as has often been observed, a step to be taken cautiously." This hesitation in resorting to legislative history to contradict plain statutory language is timely. We note that with the swiftly growing use of the staff system by Congress, many congressional documents may be generated that are not really considered fully by each or perhaps by any legislator. Thus, committee reports and the like are perhaps less trustworthy sources of congressional intent than they used to be, and less than the actual wording of the legislation, which one would hope received more thorough consideration prior to enactment. If there is inadvertent error either in the statute, or in the committee report, the offender is more likely to be the latter, surely.

We further note that the context of the legislative history, to our minds, makes the statements of intent as to the proper length of the limitations period more suspect. The overall purpose of the 1960 amendments to the foreign tax credit was to inhibit certain taxpayers from achieving "double benefits" through adroit manipulation of the limitations period. S.Rep. No. 1393, *supra*, 1960-2 C.B. at 880. The statements alluding to the period available for choosing a credit or deduction for foreign taxes, follow immediately after a detailed explanation of why the bill altered the statute of limitations period for changing an election of the per country limitation to an overall limitation under section 904. No logical connection is stated in the few transitional words the committee uses. Congress was acting in a climate of concern over the existence of a potential double tax benefit from shifting overall and per country elections and taking advantage of the carryback provisions. There is no indication that the plight of the taxpayer who, far from attempting to extract a double benefit by shifting elections, is simply trying to avoid double taxation, ever really came under the congressional eye. In light of earlier concern over inequities present in depriving the taxpayer of the credit when a foreign tax is assessed after the running of the three year period, we are not inclined lightly to reinstate the three year period on the basis of a short

statement inserted in the context of a discussion of amendments designed principally to remedy another evil.

This leads to another factor increasing our reluctance to depart from the unambiguous letter of the statute in favor of statements made in committee reports. "In resolving ambiguity, we must allow ourselves some recognition of the existence of sheer inadvertence in the legislative process." *Cass v. United States,* 417 U.S. 72, 83, 94 S.Ct. 2167, 2173, 40 L.Ed.2d 668 (1974), quoting from a dissent in this court. There is, of course, an ever present margin for error in compiling committee reports, as well as in drafting legislation. This may be compounded by the tendency of staffs to copy each others' reports. There are here, possible avenues of error: one is that the legislators' or staff's attention was called to the problem of the ten year period, and they simply erroneously decided to address the matter in the legislative history rather than correct the statute itself. If such was the intent, it cannot be given effect against clear statutory language to the contrary. Still another possibility is that the drafters intended altering the ten year limitations period, wrote the committee records accordingly, then decided not to change the statute, but neglected to withdraw the statements put into the committee reports. Because of the manifest possibility of error either in drafting the provision itself, or in writing the legislative history, and the failure to explain the contradictions which such errors may have caused, we are not convinced that the committee reports provide conclusive evidence of an intent by Congress that the statute be construed in a manner contrary to its plain meaning.

We reiterate that the reports asserted the new statutory language did something it manifestly did not do: it did not correct the 1954 language in any way to make clearer the asserted intent respecting a three year election period. Suppose the writer of this was correct about the 1954 intent, still he refers to the 1960 language in words that misdescribe it. Any Congressman who con-

sidered both the report and the bill should have perceived the contradiction, and if he voted for the bill, it is hard to say what he might have intended to accomplish. We cannot conclude, in the words we have previously used, that even the authors of the committee report believed they were fairly construing the statutes as enacted. Their words are equally or more consistent with the belief by the authors that it is possible to legislate by committee report instead of by statute, or with the occurrence of a plain and simple inadvertent error.

We note for whatever it is worth that the judiciary is traditionally unwilling to find that an earlier statute has been repealed by implication in later legislation, unless that is clearly and manifestly the intent of Congress. *See, e. g., Tennessee Valley Authority v. Hill, supra,* 437 U.S. at 153, 98 S.Ct. 2279; *Morton v. Mancari,* 417 U.S. 535, 549, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974); *International Telephone & Telegraph Corp. v. United States,* 536 F.2d 1361, 1371, 210 Ct.Cl. 410, 428 (1976); *Abell v. United States,* 518 F.2d 1369, 1377–78, 207 Ct.Cl. 207, 222–24 (1975), *cert. denied* 429 U.S. 817, 97 S.Ct. 59, 50 L.Ed.2d 76 (1976). In this instance the rule would apply even more rigorously, as the "repeal" at best is manifested not in text but in legislative history. The amending legislation, read literally, does not conflict with and displace the 1954 law. Rather, the more natural reading of the 1954 Code and the 1960 amendments is that they provide, in harmony, a ten year period in which the taxpayer may elect the credit. The circumstances here militate strongly against the construction urged by defendant.

*Aparacor, Inc. v. United States, supra,* and *Prairie Band of the Pottawatomie Tribe of Indians v. United States, supra,* are good examples of the caution required when it is proposed to use legislative history to overrule plain language. Both differ from this case in that there also appeared legislative history to support the plain language, but the grounds for suspecting the

history to conceal a pitfall are just as good here for other reasons. In the second case, the fact Congress acted on incorrect information is treated as not justifying a departure from plain language. Here it was given incorrect information in the committee reports. In the Supreme Court case, *St. Paul Fire & Marine Insurance Co., supra,* the legislative history was likewise conflicting. In the "snail darter" case, *Tennessee Valley Authority v. Hill, supra,* the Court addressed the question whether appropriations for the Tellico Dam effected a repeal or exemption *pro tanto* from the Endangered Species Act, in view of committee statements reporting the appropriations and stating that the Act did not prevent completion of the project. It was held they did not have that effect. While the case is not exactly parallel to ours, it does inculcate a suspicion as to the capacity of committee reports to effectuate legislative changes in unambiguous statutes.

The facts in cases involving this kind of problem will never twice be the same. The use of legislative history is not a mechanical technique with fixed and rigid rules, but an art, dependent within reasonable limits on the court's sense of what Congress really meant to do. Assuming without deciding that unambiguous statutory language, not producing absurd results is not enough to bar resort to contradictory legislative history absolutely, it does indicate extreme caution. Congress may be presumed not unskilled in the use of words and highly likely to have enacted what it intended. It is foolish to abandon this presumption where the legislative history is perceivably full of pitfalls that cannot readily be avoided. Some pitfalls are invisible to the judicial eye, but the most myopic can see one in a committee report that contradicts the plain language of a statute in guise of interpreting it, or makes manifestly incorrect statements about it or what it does. Suspect in any case, such reports are more so when they purport to interpret earlier legislation, not that now pending. The penchant of Congress to try to correct errors in legisla-

tion retroactively by extra statutory or statutory statements about them, has been noted and given appropriate consideration in cases that are cited above. Another factor is the absence of any reason why the three year rule should apply to elections but not increases in credit claims, save perhaps to provide a trap for the unwary. We cannot hold that the legislative history the defendant relies on is sufficiently persuasive to overcome the presumption that the Congress meant what it enacted.

We could hope for beneficial results, too, if this case should lead congressional committees to write corrective legislation when they perceive errors in statutes, rather than make bold assertions in committee reports, in the hope they will be accepted as valid legislative history. People are entitled to find in the statute books the laws that govern them. This is not, of course, to say that there is any evidence that an error existed in the 1954 legislation, relevant to this case.

In view of all the circumstances, we hold that defendant's interpretation of the statute is incorrect, and that the regulation, being contrary to the plain language of the statute, cannot stand.

Accordingly, plaintiff's motion for summary judgment is granted and defendant's cross-motion is denied. Judgment is entered for plaintiff and the case is remanded to the trial division for proceedings under Rule 131(c) to determine the amount of recovery.

## APPENDIX I

The second sentence of § 901(a) was originally enacted into law as an addition to the first sentence of 1939 Code § 131(a) by the Revenue Act of 1942. This second sentence of § 131(a) was carried over substantially unchanged from the 1939 Code into § 901(a) of the 1954 Code and then through the 1960 amendment thereto in the following manner:

## APPENDIX I—Continued

| § 131(a)(1942) [1] | § 901(a)(1954) [2] | § 901(a)(1960) [3] |
|---|---|---|
| Such choice | Such choice | Such choice for any taxable year |
| may be made or changed at any time prior to the expiration of the period prescribed for making a claim for credit or refund of the tax imposed by this chapter. | may be made or changed at any time prior to the expiration of the period prescribed for making a claim for credit or refund of the tax | may be made or changed at any time *before* the expiration of the period prescribed for making a claim for credit or refund of the tax imposed by this chapter |
| | against which the credit is allowable. | |
| | | for such taxable year. |

[1] Int.Rev.Code of 1939, ch. 1, § 131(a), 53 Stat. 56, *as amended by* Revenue Act of 1942, ch. 619, § 158(a), 56 Stat. 856.
[2] Int.Rev.Code of 1954, ch. 1, § 901(a), 68A Stat. 285.
[3] Act of Sept. 14, 1960, Pub.L. No. 86–780, § 3(b), 74 Stat. 1013 (current I.R.C. § 901(a)).

DAVIS, Judge, dissenting, with whom FRIEDMAN, Chief Judge, joins:

In *Bank of America v. United States*, 377 F.2d 575, 180 Ct.Cl. 111 (1967), the court—facing a problem substantially identical with that now before us, except that the significant events all occurred before the 1960 statute and were governed by the pre–1960 law—held that the normal reading of the pre–1960 Code provisions gave taxpayers ten years and that the pre–1960 legislative history was not inconsistent with that construction. Expressly recognizing that the 1960 legislative history rebutted the 10-year reading and that the 1960 reenactment (with minor changes in wording) was made retroactive, the court refused to give effect to that understanding in a pre–1960 case because of the constitutional difficulties which would arise if the law was changed retroactively to defeat expectations. " * * * it is our conclusion, stemming from the proposition that Congress would not intentionally raise a serious constitutional problem that Congress did not intend to retroactively change the pre–1960 law even though it expressly made the new language retroactive. It simply 'intended' that the new language have the meaning of the old language, at least until 1960." 377 F.2d at 580, 180 Ct.Cl. at 120.

At the same time, the court several times reserved the question of the impact of the "law after 1960." *See* 377 F.2d at 577, 580, 180 Ct.Cl. at 116, 119, 120. Though the "1960 changes in the original language of section 901 are so slight that they appear to be insignificant; * * * it may be significant that changes were in fact made, and resort to the legislative history may be warranted for this reason. * * * Analytically, it would be possible to decide that in the light of the legislative history, the apparently insignificant language changes effected a change (as contrasted with a clarification) in the 'old' law, so that after 1960, choices must be within the 3-year period. * * * Regarding the period following enactment of the 1960 legislation, it is possible that the 1960 Congress intended that the choice be made within the 3-year period regardless of the intent of the 1954 Congress. It is not necessary for us to reach that question." 377 F.2d at 579–80, 180 Ct.Cl. at 118–19.

I continue to adhere to *Bank of America* for pre–1960 cases, but differ from the majority in this post–1960 instance. My reasons, foreshadowed by our reservation in *Bank of America*, are grounded on these linked propositions:

(a) in 1960, Congress was actually legislating; it enacted the relevant statute for the future, though with only minor changes; it was not merely expressing its view of the coverage of the old law without legislating on that very subject;

(b) the clear view given in 1960 by the appropriate committees in their reports—the chief organ of expression of congressional views—is not impossible to reconcile with the statutory language (though it is not the preferable understanding of the bare wording); [1]

---

1. It must be remembered that at the time the 1960 law was enacted, there was no judicial interpretation outstanding.

(c) the position stated by the committees in their reports was in no way inadvertent but rather deliberate and considered;

(d) the greatest of deference is due the concurring views of the relevant committees on the meaning of legislation being enacted by that Congress when those views are clear, possible to reconcile with the language of the act, and uncontradicted by any other significant piece of legislative history; and

(e) it would not be inappropriate to construe the statute in one way after its 1960 modification and reenactment, and the other way for the period before the 1960 legislation. I now explore these propositions seriatim.[2]

1. This is not a case in which a later Congress may merely have given or intimated its understanding of a statute passed by a prior Congress—through committee reports or comparable channels of communication, or through passage of a related statute which is based on a particular view of the prior legislation but does not purport to change or reenact it. In this instance Congress amended and reenacted the portion of section 901(a) concerning the time for choosing the foreign tax credit. Congress was thus legislating on and passing a provision which is crucial to this case, not simply announcing or suggesting its construction of some prior enactment not then before it. In connection with the passage of the 1960 statute, the two committees squarely stated their purpose, in amending and reenacting section 901(a), to confine the choice of the foreign tax credit to the 3-year limitation period. They said that the

second sentence of section 901(a) was being amended "to make it clear" that the 3-year period governed. S.Rep.No. 1393, 86th Cong., 2d Sess. 15, *reprinted in* [1960] U.S. Code & Admin.News pp. 3770, 3784. *Accord* H.R.Rep.No. 1358, 86th Cong., 2d Sess. 11–12 (1960). We may think that the simple and minor changes actually made did not in fact make that objective clear on the face of the statute, but it cannot be denied that the committees had that very purpose in recommending the modification and passage of the revised section 901(a). Their reports related to and interpreted a measure then being considered by that Congress and specifically told the legislators what result the committees intended to reach in that very legislation.[3] We must therefore consider the reports as an intrinsic part of the operative congressional process in passing the statute, not as a mere pronouncement on the meaning of some prior statute. *See Commissioner v. Bilder*, 369 U.S. 499, 82 S.Ct. 881, 8 L.Ed.2d 65 (1962), discussed *infra*.[4]

2. Underlying the court's opinion seems to be the assumption that it is impossible to reconcile, on any basis, the committees' position with the language of the act. I do not share that assumption. Though I agree that the interpretation adopted in *Bank of America* accords better with the wording as it would normally be understood, it seems to be conceivable to read the text as the committees thought it should be. Defendant points out that the critical words of section 901(a) are that "[s]uch choice * * may be made or changed," and argues that the "choice" referred to is solely the choice

---

**2.** I agree, in short, with the Ninth Circuit's observation in *United States v. Woodmansee*, 578 F.2d 1302 (1978) that "There is merit in appellant's [taxpayer's] argument that the language of the statute supports his position. Yet, on the other hand, the legislative history shows Congress intended the three-year limitation period to be applied as a general rule." 578 F.2d at 1304 (citations omitted). The Ninth Circuit refused to decide which was the proper general rule, deciding *Woodmansee* on the special facts of that specific case. For the general rule, I would give effect to the legislative history.

**3.** Neither the majority nor taxpayer denies that the views of the committees were clearly and unambiguously stated.

**4.** There is no contrary teaching in the rejection in *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 189–193, 98 S.Ct. 2279, 2299–2301, 57 L.Ed.2d 117 (1978)—the "snail darter" case—of subsequent appropriations for the Tellico Dam as showing that the structure was not to be covered by the Endangered Species Act. That history did not concern the Endangered Species Act itself (or any amendment to it) but later enactments thought to express Congress's interpretation of the Species Act or impliedly to repeal part of it.

between a credit or a deduction for the foreign tax; the initial choice of a credit (rather than a deduction) must be made (it is said) within three years, or if a deduction has initially been chosen the change to a credit, if desired, must be made within the same period. *See* I.R.C. § 901(a). On this view, section 6511(d)(3)(A) assumes that a credit has already been timely chosen and allows ten years for an increase in the credit where choice of the credit has already been made within three years. Defendant's briefs spell out this position elaborately and in detail [5]—pointing out, for instance, that the general reference in section 901(a) to the time for making the "choice" as "the period prescribed for making a claim for credit or refund of the tax imposed by this chapter for such taxable year" can refer to section 6511(a), establishing the general "period of limitation on filing claim" (*i. e.,* the 3-year period), rather than the "special period" set up by section 6511(d)(3)(A) (*i. e.,* the 10-year period).[6]

I need not accept as correct this over-refined and too-sophisticated reading of the face of the statute (unsupported by any significant pre–1960 history) to see that it is neither impossible nor an unduly violent departure from the text. Indeed, that seems to have been the construction adopted by the Joint Committee on Internal Revenue Taxation, surely not a novice or interloper in the tax field, for the pre–1960 period during which the Internal Revenue

Service was tending to follow plaintiff's interpretation. *See Bank of America v. United States,* 377 F.2d 575, 576–77, 180 Ct.Cl. 111, 114–15 (1967). Thus, the 1960 committees were not, in my opinion, stretching the wording sharply beyond the outermost breaking point when they took their stance.[7] On the contrary, my judgment is that, if the explicit statements in the 1960 committee reports had appeared in the committee reports (with respect to section 901(a)) when section 901(a) was adopted in 1954 for the 1954 Code, they would have unhesitatingly been given effect by the courts as well as by the Service, even though those express statements seemed to strain the bare wording.[8] It often happens that tax legislation is given a special, refined reading (rather than the normal everyday interpretation) because the pertinent committees have plainly indicated that it should be. Especially with tax statutes, the so-called "plain meaning" can be overcome by express legislative history entitled to acceptance because of its source and character. *See, e. g., Commissioner v. Bilder,* 369 U.S. 499, 82 S.Ct. 88, 8 L.Ed.2d 65 (1962), discussed *infra.*

3. Moreover, I have no doubt that the committees' statement of their concurrent understanding of the statute was deliberate and intentional—in no sense inadvertent. While the Internal Revenue Service tended to favor the 10-year span under the "old

---

5. Including substantial argument that the pre–1960 legislative background is not inconsistent with the Government's present construction of the Act, though it may not affirmatively support it.

6. Defendant also points out that section 6511(d)(3)(A) does not refer at all to a "change" and mentions only a "credit" (not a "deduction"); from this defendant infers that that special provision applies only where a credit has already been chosen within 3 years, permitting 10 years for an increase in the credit already chosen. *See* I.R.C. § 6511(d)(3)(A). In the same connection, the Government underscores that there is only one limitations period for both a credit and a deduction, and that it is very difficult to read the statute as permitting a deduction to be claimed within the 10-year period.

7. I repeat that, at that time, there were no contrary judicial interpretations. Insofar as any official construction existed, it had to be inferred from Service regulations and positions; there was not even an explicit Service ruling or regulation sustaining the ten-year period. *See Bank of America v. United States,* 377 F.2d 575, 578, 180 Ct.Ct. 111, 117 (1967).

8. In accepting the 10-year period for pre–1960 cases, we stressed in *Bank of America,* as an important factor, that the Service had accepted the taxpayers' position as a matter of policy. *See* 377 F.2d 575, 576–77, 578, 180 Ct.Cl. 111, 114, 117, 118 (1967). We also found that the pre–1960 legislative history failed to support the Government's position (though we likewise found little affirmative support in the history for the 10-year period). *Id.* 377 F.2d 578–79, 180 Ct.Cl. 117–18.

law",[9] the Joint Committee on Internal Revenue Taxation seems to have considered that to be a mistaken interpretation of the existing law which should not be adopted. *See Bank of America*, 377 F.2d 575, 576–77, 180 Ct.Cl. 111, 114–15 (1967). The Joint Committee is composed of members of the Senate Finance Committee and of the House Ways and Means Committee; doubtless the Joint Committee's position paralleled that of the two legislative committees. When the 1960 Act came before the Congress,[10] it served as an appropriate vehicle through which to make clear that Congress intended the 3-year period to control the choice of a credit and that the Service's contrary position, informally taken, was erroneous. I reemphasize that (i) at that time there was no court ruling or intimation favoring the 10-year limitation, (ii) even the IRS interpretation was informal rather than formal, and (iii) the congressional committees believed that the 1954 Code already limited a taxpayer's period of choice to three years. Being of this view that the statute already confined the choice of the credit to three years, the two committees acted naturally when they felt that extensive changes in the statute were unnecessary and a clear statement in the committee reports, plus some minor modifications in language, would be enough. The court refuses to acknowledge this possibility because it believes that the face of the statute could not reasonably be read by anyone as selecting the shorter period for the choice of a credit. Since I take the committees' interpretation as rational (though mistaken, in the absence of any affirmative pre–1960 legislative history supporting it), I can understand why they acted as they did. I conclude, too, that there was only a minimal chance of inadvertence in adoption of the explicit committee statements on which defendant relies. The committees meant exactly what they said and intended that the reenacted statute should be read in the way they outlined.

4. If, as I think, the words of the statute—considered alone—could be seen as having an ambiguous aspect and because the committees' concurrent statements were clear, unambiguous, and purposeful, the committees' 1960 position should control. There is nothing in the rest of the 1960 legislative history to contradict or detract from that position. At least when the legislative text can conceivably be thought to contain some elements of ambiguity, it is still the rule that extrinsic aids to construction can and should be considered. *See Train v. Colorado Pub. Int. Research Group*, 426 U.S. 1, 9–10, 96 S.Ct. 1938, 48 L.Ed.2d 434 (1976); *Cass v. United States*, 417 U.S. 72, 77–79, 94 S.Ct. 2167, 40 L.Ed.2d 668 (1974); *United States v. American Trucking Ass'ns*, 310 U.S. 534, 543–44, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940); *United States v. Dickerson*, 310 U.S. 554, 561–62, 60 S.Ct. 1034, 84 L.Ed. 1356 (1940). *See generally* Murphy, *Old Maxims Never Die: The "Plain Meaning" Rule" and Statutory Interpretation in the "Modern" Federal Courts*, 75 Col.L.Rev. 1299 (1975). Of these helps, explicit committee reports (especially where there is no extrinsic material to the contrary) stand in the highest rank. The Supreme Court has often given effect to such statements. *See, e. g., Chandler v. Roudebush*, 425 U.S. 840, 859 n. 36, 96 S.Ct. 1949, 48 L.Ed.2d 416 (1976); *Commissioner v. Bilder*, 369 U.S. 499, 82 S.Ct. 881, 8 L.Ed.2d 65 (1962); *NLRB v. Lion Oil Co.*, 352 U.S. 282, 292, 77 S.Ct. 330, 1 L.Ed.2d 331 (1957). Justice Frankfurter said in his famous article on statutory interpretation: "A painstaking, detailed report by a Senate Committee bearing directly on the immediate question may settle the matter." Frankfurter, *Some*

---

**9.** This is indicated by the ambiguous pre–1960 regulation citing the 10-year provision and, most strongly, by the Service's acceptance (before the intervention of the Joint Committee) of Bank of America's claim that the 10-year statute governed. *See Bank of America*, 377 F.2d 575, 576–77, 578, 180 Ct.Cl. 111, 114–15, 117.

**10.** The 1960 statute, Pub.L.No. 86–780, 74 Stat. 1010 (codified at I.R.C. §§ 901, 904, 1503, 6038, 6046), was entitled "An Act to amend the Internal Revenue Code of 1954 to permit taxpayers to elect an overall limitation on the foreign tax credit"; about half of the measure dealt with various aspects of the foreign tax credit.

*Reflections, On the Reading of Statutes,* 47 Col.L.Rev. 527, 543 (1947). *See also* Professor Harry W. Jones' article, *Statutory Doubts and Legislative Intention,* 40 Col.L. Rev. 957, 968–69 (1940), discussing this problem and quoting from Learned Hand in *SEC v. Robert Collier & Co.,* 76 F.2d 939, 941 (2d Cir. 1935).

*Commissioner v. Bilder,* 369 U.S. 499, 82 S.Ct. 881, 8 L.Ed.2d 65 (1962), is almost directly in point (as I see this case). Under the 1939 Internal Revenue Code, taxpayers were permitted by the IRS and the courts to deduct, as part of their expenses for "medical care," food and rental costs incurred while spending the winter months in Florida (for example) as part of a regimen of medical treatment. In the 1954 Code, the Congress adopted the very same language with respect to the general scope of "medical care" deductions, but the committee reports both said expressly that living expenses while in Florida (again, for example) were not to be deductible. A minor addition was made to the statute (with respect to transportation for medical purposes) but that change would not seem, in itself, to change the prior rule as to living expenses while away from home. Nevertheless, as in the present instance, the committees hinged their new interpretation on this addition, and said they were "clarifying" the existing law. *See* 369 U.S. at 501–03, 82 S.Ct. 881.

The Supreme Court through Justice Harlan sustained the committees' understanding, in words equally applicable here:

Since under the predecessor statute, as it had been construed, expenses for meals and lodging *were* deductible as expenses for "medical care," it may well be true that the Committee Reports spoke in part inartistically when they referred to subsection (e) as a mere clarification of "existing law," although it will be noted that the report also referred to what was being done as a *pro tanto* "change" in "the existing definitions of medical care." Yet Congress' purpose to exclude such expenses as medical deductions under the new bill is unmistakable in these authoritative pronouncements * * *. It is that factor which is of controlling importance here. (369 U.S. at 503–04, 82 S.Ct. at 883) (emphasis in original).

The Court also observed that "the explicitness of the Committee Reports renders it unnecessary to consider the Commissioner's alternative argument [also made in the present case] that the statute on its face precludes these deductions * * *." 369 U.S. at 504 n. 5, 82 S.Ct. at 884. This means that the Court was willing to assume *arguendo* that the statute on its face did not bar the deduction. The Court then added that "the equitable considerations which the respondent [the taxpayer] brings to bear in support of her construction * * are of course beside the point in this Court, since we must give the statute effect in accordance with the purpose so clearly manifested by Congress." *Id.*[11]

11. I should point out that the Supreme Court observed that it "need not consider whether we would be warranted in disregarding these unequivocal expressions of legislative intent if the statute were so written as to permit no reasonable construction other than that urged on behalf of the taxpayer." 369 U.S. at 504, 82 S.Ct. at 884. The Court went on to say that the statute was considered to be ambiguous and that the interpretation of the identical provision of the 1939 Code "necessarily rested on what emerged from a study of the legislative history of that enactment. So too the conclusion in this case, which turns on the construction of the identical words re-enacted as part of § 213 [of the 1954 Code provision], must be based on an examination of the legislative history of this provision of the 1954 Code. The Committee Reports foreclose any reading of that provision

which would permit this taxpayer to take the rental payments for his Florida apartment as 'medical care' deductions." 369 U.S. at 504–05, 82 S.Ct. at 884.

As I have said, I do not see the Government's position in the present case as an impossible or unreasonable construction of the bare legislative text. The majority views the matter otherwise but fails to take account of the significant fact that our *Bank of America* decision reached its conclusion only after considering the pre-1960 legislative history and IRS policy (including a Treasury Regulation), in addition to the text of the legislation. The court said: "So if we had only the 1954 language *and history* of section 901 before us, we would have little difficulty in reading the statute to allow 10 years to change a choice—*particularly in view*

*Bilder,* though probably the closest example, is not alone in giving effect to legislative history which puts strain on statutory language. Perhaps the best known case is *United States v. Dickerson,* 310 U.S. 554, 60 S.Ct. 1034, 84 L.Ed. 1356 (1940), in which the Supreme Court—because of the clear legislative history—construed a mere restriction on the use of appropriated monies to pay reenlistment bonuses as a suspension of the substantive statutory provision granting such payments. Far more "violence" was done to the literal words in that case than is necessary here.

5. Only a few words are needed on the propriety of adhering to *Bank of America* for pre–1960 cases and, at the same time, adopting the other rule for the cases arising after and governed by the 1960 statute. That legislation purports on its face to make its changes with respect to the limitations period retroactive to 1953–54, but *Bank of America* decided that the 1960 Congress did not intend to change the pre–1960 law if it should turn out (as it did) that the 1960 Congress was mistaken as to the intent of the Congress which adopted sections 901 and 6511(d)(3)(A) in 1954. There is nothing inconsistent between that position, grounded in avoidance of a serious constitutional problem caused by retroactivity, and a prospective construction of the statute to impose the 3-year limitations period. My conclusion does not differ in result or theory from the *Bilder* decision, which accepted one construction of "medical care" deductions for the 1939 Code and the opposite one for the 1954 Code, even though the Court assumed that there was no substantial difference in the wording of the two provisions. As the *Bank of America* opinion observed, it is analytically possible to hold that, in the light of the 1960 legislative history, the apparently insignificant language changes effected a change (as contrasted with a clarification) in the "old" law, so that after 1960 the choice of the tax credit must be made within the 3-year period—and that this was the intention of the

*of the administrative [IRS] policy." Bank of America v. United States,* 377 F.2d 575, 579, 180 Ct.Cl. 111, 118 (emphasis added) (1967). It

1960 Congress regardless of the intent of the 1954 Congress. 377 F.2d 575, 579, 180 Ct.Cl. 111, 119 (1967); *see Commissioner v. Bilder, supra,* 369 U.S. 499, 504–05, 82 S.Ct. 881 (1962). There is no unfairness to taxpayer in this conclusion; the taxable years involved here are 1967–1970, several years after passage of the 1960 statute and well after the adoption of the current Treasury Regulation expressly making the 10-year period inapplicable. Treas.Reg. § 1.901– 1(d) (1965); *see* Rev.Rul. 63–248, 1963—2 Cum.Bull. 623. There was fair and adequate warning of the new position.

For these reasons, I would hold for the Government in accordance with the committees' reading of the statute.

is clear that more than the bare text was weighed in our evaluation.